# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 13, 2017        Decided January 12, 2018

No. 16-5327

STAND UP FOR CALIFORNIA!, ET AL.,
APPELLANTS

PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS, A
FEDERALLY RECOGNIZED INDIAN TRIBE,
APPELLANT

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

NORTH FORK RANCHERIA OF MONO INDIANS,
INTERVENOR-APPELLEE

———

Consolidated with 16-5328

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:12-cv-02039)

———

*Sean M. Sherlock* argued the cause for appellants Stand Up for California!, et al. With him on the briefs were *Todd E. Lundell* and *Benjamin Sharp*. *Jennifer A. MacLean* entered an appearance.

*Michael A. Robinson* argued the cause for appellant Picayune Rancheria of the Chukchansi Indians. With him on the briefs was *James Qaqundah*. *Merrill C. Godfrey* entered an appearance.

*Brian C. Toth*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Jeffrey H. Wood*, Acting Assistant Attorney General, and *Eileen T. McDonough*, Attorney. *Mary G. Sprague*, Attorney, entered an appearance.

*Seth P. Waxman* argued the cause for intervenor-appellee North Fork Rancheria of Mono Indians. With him on the brief were *Danielle Spinelli*, *Christopher E. Babbitt*, *Jonathan A. Bressler*, *John T. Byrnes*, and *John M. Schultz*.

Before: GARLAND, *Chief Judge*, TATEL, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Following a nearly seven-year administrative process, the Interior Department took a tract of land into trust for the North Fork Rancheria of Mono Indians, a federally recognized Indian tribe based in California, and authorized it to operate a casino there. Several entities, including nearby community groups and an Indian tribe with a competing casino, challenged the Department's decision in United States district court, raising a host of statutory, regulatory, and procedural challenges. In a thorough and persuasive opinion, the district court granted summary judgment to the Department on most claims and dismissed the remainder. For the reasons set forth in this opinion, we affirm.

3

**I.**

Facing high unemployment, inadequate public services, and an uncertain revenue stream, the North Fork Rancheria of Mono Indians (the "North Fork") proposed in March 2005 to stimulate economic development by building a large-scale casino complex. Because the North Fork's existing land was ill-suited to the purpose, it asked the U.S. Department of the Interior (the "Department") to exercise its authority under the Indian Reorganization Act (IRA), 25 U.S.C. § 5101 *et seq.*, to acquire land "for Indians," *id.* § 5108, by taking a largely undeveloped, 305-acre tract of land in Madera County into trust for the tribe. But because a different statute—the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*— generally prohibits gaming on newly acquired Indian trust land, *see id.* § 2719(a), the tribe also asked the Department to determine that it qualified for a statutory exception, available where the Department "determines [1] that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and [2] would not be detrimental to the surrounding community," and "[3] the Governor of the State in which the gaming activity is to be conducted concurs in the [Department's] determination," *id.* § 2719(b)(1)(A). The Department made the requested determination in September 2011, and California's governor concurred soon after. *See* U.S. Department of the Interior, Secretarial Determination Pursuant to the Indian Gaming Regulatory Act for the 305.49-Acre Madera Site in Madera County, California, for the North Fork Rancheria of Mono Indians 89 (2011) ("IGRA Decision"), Joint Appendix (J.A.) 3961; Letter from Edmund G. Brown, Jr., Governor of California, to Kenneth L. Salazar, U.S. Secretary of the Interior (Aug. 30, 2012), J.A. 4014–15.

Before it could take the land into trust, however, the Department had to ensure that the project was consistent with

the Clean Air Act, 42 U.S.C. § 7401 *et seq.* That Act provides that "[n]o department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform" to a state's plan for achieving federally mandated air quality standards. *Id.* § 7506(c). Prior to making a final "conformity determination," the agency must provide 30-day advance notice to the public, 40 C.F.R. § 93.156(b), and to tribal and governmental entities specified in Environmental Protection Agency (EPA) regulations, *see id.* § 93.155(a). EPA regulations also require that the conformity determination be based on "the latest and most accurate emission estimation techniques available." *Id.* § 93.159(b). Having given advance notice to the public and to most—but not all—entities expressly entitled to receive it, the Department in June 2011 determined that, under California's latest available emissions model, the casino would conform to the state's plan for achieving and maintaining the Clean Air Act's federal air quality standards.

Based, among other things, on its findings that the proposed casino complied with IGRA and the Clean Air Act, the Department in November 2012 agreed to take the tract of land into trust for the North Fork. *See* U.S. Department of the Interior, Trust Acquisition of the 305.49-Acre Madera Site in Madera County, California, for the North Fork Rancheria of Mono Indians 1 (2012) ("Trust Decision"), J.A. 4041. Stand Up for California!—a nonprofit organization focusing on the community effects of gambling—along with five other casino opponents (collectively, "Stand Up"), all appellants here, sued the Department and the Bureau of Indian Affairs. Another appellant, the Picayune Rancheria of the Chukchansi Indians (the "Picayune"), which operates a casino expected to compete with the North Fork's, filed a similar suit. The district court consolidated the cases and the North Fork intervened as a

defendant. *See Stand Up for California! v. U.S. Department of the Interior*, 204 F. Supp. 3d 212, 234 (D.D.C. 2016).

Stand Up and the Picayune argued that the Department's trust decision violated the IRA, IGRA, the Clean Air Act, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* Most directly, they argued that the North Fork is not an Indian tribe for which the Department has IRA authority to acquire land. They also argued that the acquisition rested on faulty predicates, namely, the Department's determinations that the proposed casino complied with the Clean Air Act and qualified for the IGRA exception, as well as the California governor's concurrence in the latter determination.

After the district court remanded the Clean Air Act conformity determination without vacatur so that the Department could correct its initial failure to notify all entities entitled to notice under EPA regulations, *see Stand Up for California!*, 204 F. Supp. 3d at 236, the parties filed cross-motions for summary judgment. The district court, Chief Judge Howell, denied summary judgment to Stand Up and the Picayune, dismissed Stand Up's claims for failure to join an indispensable party—California—insofar as those claims challenged the California governor's concurrence in the Department's IGRA determination, and granted the federal defendants and the North Fork summary judgment on all other relevant claims. *Id.* at 323.

Stand Up and the Picayune now appeal. We review the district court's summary judgment rulings *de novo*, evaluating the administrative record directly and invalidating the Department's actions only if, based on that record, they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46, 54 (D.C. Cir. 2015) (quoting 5 U.S.C.

§ 706(2)). In doing so, we defer to the Department's reasonable interpretation of ambiguities in statutes it is tasked with implementing and give "substantial deference" to the Department's "interpretation of its own regulations unless it is contrary to the regulation[s'] plain language." *Confederated Tribes of Grand Ronde Community of Oregon v. Jewell*, 830 F.3d 552, 558–59 (D.C. Cir. 2016). We accept the Department's factual findings so long as they are supported by substantial evidence in the record. *See Center for Auto Safety v. Federal Highway Administration*, 956 F.2d 309, 313 (D.C. Cir. 1992).

## II.

We begin with Stand Up's threshold argument that the Department lacked statutory authority to take land into trust for the North Fork. The IRA provision pursuant to which the Department acted, 25 U.S.C. § 5108, authorizes it to acquire land "for Indians," *id.*, defined as "all persons of Indian descent who are members of any recognized Indian tribe" that was "under Federal jurisdiction" at the time of the IRA's 1934 enactment, *id.* § 5129; *see Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) (interpreting IRA's "Indian" definition to include only tribes that were under federal jurisdiction in 1934).

Conceding that the North Fork is now a "recognized Indian tribe," Stand Up Br. 6, Stand Up argues that the Department lacked substantial evidence to find, as the IRA requires, that the North Fork was a tribe "under Federal jurisdiction" in 1934. The Department rested that finding primarily on its earlier decision, roughly contemporaneous with the IRA's enactment, to hold a special election at the North Fork's reservation, the North Fork Rancheria, pursuant to an IRA provision authorizing the Department to give reservations the opportunity to vote within a year of the IRA's passage on whether to accept the statute's coverage. *See* 25 U.S.C. § 5125

(authorizing the Department to call special elections). Stand Up concedes that such an election, called a section 18 election, is, for IRA purposes, sufficient to establish federal jurisdiction over a participating tribe. Oral Arg. at 9:33–10:48; *cf. Confederated Tribes of Grand Ronde*, 830 F.3d at 563–64 (upholding IRA interpretation that finds "federal jurisdiction" over a tribe if governmental actions in or before 1934 "reflect federal obligations, duties, responsibility for or authority over the tribe"). In its view, however, the record here was insufficient to establish, broadly, that the participants in the North Fork's section 18 election belonged to any one tribe or, more narrowly, that they belonged to a tribe with any connection to today's North Fork Indians. We consider each of these arguments in turn.

## A.

The IRA authorized "*reservation*[*s*]" to hold section 18 elections within a year of its enactment. 25 U.S.C. § 5125 (emphasis added). Stand Up argues that although a section 18 election can demonstrate that the voters in such an election resided on a single *reservation* falling under federal jurisdiction in 1934, it cannot demonstrate that they belonged to a single "Indian *tribe* [then] under Federal jurisdiction," *id.* § 5129 (emphasis added), eligible to receive trust land today. This argument ignores the IRA's plain text. The statute provides that "[t]he term 'tribe' wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, *or the Indians residing on one reservation*." *Id.* (emphasis added). Because the North Fork Rancheria, eligible to hold a section 18 election, was a "reservation" at the IRA's enactment, *id.* § 5125, the voters—whose Indian or resident status Stand Up nowhere disputes—were "Indians residing on one reservation" at that time and so, by the IRA's own terms, constituted a "tribe," *id.* § 5129.

According to Stand Up, we may not now rely on the IRA's definition of "tribe" because the Department failed to cite it when concluding that the North Fork was a tribe subject to federal jurisdiction in 1934. But the Department cited the section 18 election held "at the [North Fork's] Reservation" as evidence of the North Fork's 1934 tribal status, Trust Decision at 55, J.A. 4095, and nothing suggests that in doing so the Department departed from the straightforward textual reading it has given the IRA's "tribe" definition in prior cases. *See, e.g.*, *United Auburn Indian Community v. Sacramento Area Director*, 24 IBIA 33, 41–42 (1993) (agency opinion citing IRA's "tribe" definition in finding section 18 election established tribal existence). Although we will "not supply a reasoned basis for [an] agency's action that the agency itself has not given," we may affirm "if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86 (1974). Here, that path is clear: a section 18 election on a reservation establishes that the Indian residents qualify as a tribe subject to federal jurisdiction.

Undaunted, Stand Up points to Department documents supposedly establishing that, notwithstanding the IRA's text, residency is distinct from tribal affiliation. Specifically, two 1934 interpretive opinions by the Department's Solicitor mention that certain reservation residents typically ineligible to participate in tribal affairs could nonetheless vote in their reservation's section 18 election and that a tribe split over multiple reservations could organize as a single tribe. *Cf.* 25 U.S.C. § 5123(a) (allowing a *tribe*, rather than a reservation, "to organize for its common welfare"). Stand Up also cites a 2013 court filing in which the Department acknowledges that some organized tribes lack a designated reservation.

Of course, such agency statements cannot overcome the IRA's clear text: "the Indians residing on one reservation" comprise a "tribe" under the Act. *Id.* § 5129. Besides, the materials Stand Up cites are fully consistent with the proposition that the residents of a single reservation constitute a tribe under the IRA. At most, they suggest that a reservation resident might also belong to another tribe that is *not* territorially defined. Nothing suggests that Congress precluded the possibility of holding dual tribal identities, one based on cultural or genealogical ties and another on residency. *Cf.* Act of Aug. 11, 1964, Pub. L. No. 88-419, 78 Stat. 390, 391 (clarifying that a prior statute stripping Indian status from certain reservation residents left those affected wholly bereft of Indian status only if they were "not members of any other tribe or band"). As the district court aptly noted, "nothing in the text of [the IRA] requires a tribe" within the meaning of the statute "to be 'single,' 'unified,' or comprised of members of the same historically cohesive or ethnographically homogenous tribe." *Stand Up for California!*, 204 F. Supp. 3d at 289. Stand Up's response—that yoking residency to tribal identity contravenes tribal autonomy by artificially lumping heterogeneous populations together as tribes—is best addressed to Congress.

Moreover, beyond the section 18 election, other record evidence confirms the North Fork's longstanding tribal existence. Specifically, in 1916, the Department used congressionally appropriated funds to buy the North Fork Rancheria for the tribe's use. *See* Act of June 30, 1913, Pub. L. No. 63-4, 38 Stat. 77, 86 (appropriating funds "[f]or support and civilization of Indians in California"). Stand Up insists that we may not consider this purchase because the Department treated the section 18 election alone as "conclusively establish[ing] that the [North Fork] was under Federal jurisdiction" in 1934. Trust Decision at 55, J.A. 4095. Stand Up misreads the Department's decision. Although the Department

treated the election held "at the Tribe's Reservation" as dispositive of the government's jurisdictional relationship with the reservation's residents, it presupposed that the reservation was a "Tribe's." *Id.* The source of that presupposition becomes clear in the decision's very next section, where the Department characterized the 1916 Rancheria purchase as establishing the North Fork's "tribal land." *Id.*

According to Stand Up, the beneficiary of the Rancheria's purchase was not a cohesive tribal entity, but rather a set of diverse Indian groups occupying the geographic North Fork region. Ample record evidence, however, including the 1916 purchase authorization itself, supports the Department's contrary conclusion. *See* Bethel-Fink Decl. exh. A, ECF No. 33-1 at 10 (authorizing purchase of land "for the use of the North Fork band of landless Indians"), *quoted in* Bureau of Indian Affairs Decision Package, Administrative Record NF_AR_0000776, J.A. 527; Letter from John J. Terrell, Special Indian Agent, to Commissioner of Indian Affairs 1 (Apr. 4, 1916), J.A. 532 (referring to a member "of th[e] band" of "the Indians of Northfork and v[i]cinity"); *id.* at 3, J.A. 534 ("[T]here is likely more than 200 Indians properly belonging to the Northfork and v[i]cinity band."). Nothing more is required. *See FPL Energy Maine Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002) (substantial evidence standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence").

**B.**

Stand Up next argues that even if record evidence establishes that the North Fork Rancheria's 1934 residents belonged to an identifiable tribe "under Federal jurisdiction," 25 U.S.C. § 5129, the evidence is insufficient to connect the present-day North Fork to that historic group. Our examination of the North Fork's history, however, demonstrates that even

though the tribe has had its ups and downs, substantial record evidence supports the Department's conclusion that today's North Fork traces its roots to the Indians who lived on the Rancheria in 1934.

When the Department purchased the North Fork Rancheria in 1916, some 200 Indians lived in the vicinity. By 1933, the population had dwindled to seven, and by 1955 only one adult Indian, Susan Johnson, lived at the Rancheria. Three years later, in 1958, Congress passed the California Rancheria Act, Pub. L. No. 85-671, 72 Stat. 619 (1958), which ended the federal government's trust relationship with forty-one California reservations and Rancherias, among them the North Fork Rancheria, *see id.* §§ 1, 9, and effectively divested certain residents, including Ms. Johnson, of Indian status, *see id.* § 10(b). But years later, in 1983, as part of a stipulated judgment in a case challenging the government's termination of its trust relationship with certain Rancherias, *Hardwick v. United States*, No. C-79-1710-SW (N.D. Cal.), the government reversed course, agreeing to "restore[] and confirm[]" Indian status for some who had lost it under the California Rancheria Act; to "recognize the Indian Tribes, Bands, Communities or groups of" seventeen listed Rancherias, including the North Fork Rancheria, "as Indian entities with the same status as they possessed" prior to the 1958 Act; and to list those entities as federally recognized tribes, Stipulation for Entry of Judgment, *Hardwick*, No. C-79-1710-SW, ¶¶ 2–4 (Aug. 3, 1983) ("*Hardwick* Stipulation"), J.A. 549–51.

Although acknowledging that the *Hardwick* stipulation restored the North Fork to its 1958 status and that it retains that status today, Stand Up Reply Br. 11, Stand Up insists that nothing in the record establishes that the North Fork had *any* tribal status in 1958 capable of restoration through the stipulation. This is incorrect. Substantial record evidence

supports the Department's conclusion that the North Fork continued to exist in 1958. Most obviously, Congress's 1958 decision to terminate the federal trust relationship with the North Fork via the California Rancheria Act demonstrates that there was in fact a relationship to terminate. Stand Up believes that the Act ended the government's relationship with the North Fork *Rancheria*, not with any *tribe*. But as explained above, under the IRA, the "Indians residing on one reservation" *are* a tribe. 25 U.S.C. § 5129; *see also Amador County v. Salazar*, 640 F.3d 373, 375 (D.C. Cir. 2011) (describing the California Rancheria Act as "authoriz[ing] the [Department] to terminate the federal trust relationship with several California tribes"). Moreover, and again as explained above, substantial evidence supports the conclusion that the Rancheria was itself purchased for a discernible band of North Fork Indians that included, but was not necessarily limited to, the residents of the land that became the Rancheria. The fact that only one adult member of this band—Ms. Johnson—lived at the Rancheria in 1958 is as easily attributable to the fact that the Rancheria was "poorly located and absolutely worthless as a place to build homes on" as it is to tribal dissolution. Lipps-Michaels Survey of Landless Nonreservation Indians of California 1919–1920, at 50 (July 15, 1920), J.A. 4029.

Furthermore, the *Hardwick* stipulation reinstated "the Indian Tribes, Bands, Communities or groups of" seventeen named Rancherias, including the North Fork, "as Indian entities with the same status as they possessed" in 1958. *Hardwick* Stipulation ¶ 4, J.A. 550. Stand Up reads this bargained-for provision as a nullity with respect to the North Fork. The Department, however, quite reasonably understood the provision to establish that the North Fork had a 1958 status worth restoring. Stand Up cites a Ninth Circuit decision, *Williams v. Gover*, 490 F.3d 785 (9th Cir. 2007)—in which the descendants of a terminated Rancheria's pre-1958 members

unsuccessfully challenged the Rancheria's post-*Hardwick* decision to exclude them from full tribal membership, *see id.* at 787–88—for the proposition that, as Stand Up sees it, "there is no inevitable connection between a tribe that emerged from the *Hardwick* Stipulation and those residing on a Rancheria" prior to the California Rancheria Act, Stand Up Br. 31. This misreads *Williams*. The Ninth Circuit held only that a reinstated tribe retains "power to define membership as it chooses," even if in doing so the tribe elects not to privilege *individual Indians'* pre-1958 tribal ties. *Williams*, 490 F.3d at 789–90.

Having failed to undermine the Department's perfectly reasonable reliance on the *Hardwick* stipulation as evidence that the North Fork existed in 1958, Stand Up grasps at isolated bits of the record that, in its view, nonetheless compel the opposite conclusion. It first points to a Federal Register notice terminating Ms. Johnson's Indian status pursuant to the California Rancheria Act and purporting to "affect[] only Indians who are not members of any tribe or band of Indians." Notice of Termination of Federal Supervision Over Property and Individual Members, 31 Fed. Reg. 2911, 2911 (Feb. 18, 1966). According to Stand Up, the notice's disclaimer means that Ms. Johnson—who, as the North Fork Rancheria's only 1958 adult Indian inhabitant, belonged to the North Fork tribe if such a tribe existed—had no 1958 tribal affiliation. True to form, Stand Up misreads the disclaimer. By its own terms, the disclaimer was expressly linked to a "provision[] in [a] 1964 Act" amending the California Rancheria Act, *id.*, and that amendment clarified that the original 1958 Act's provision voiding certain residents' Indian status was meant to apply to only those Indians "who [were] not members of any *other* tribe or band of Indians," Act of Aug. 11, 1964, Pub. L. No. 88-419, 78 Stat. 390, 391 (emphasis added). Put simply, the Federal Register notice indicates not that Ms. Johnson had been unaffiliated prior to 1958, but rather that she would lose Indian

status thereafter only if she belonged to no tribe other than the North Fork.

Stand Up next cites a 1960 opinion by the Solicitor of the Bureau of Indian Affairs quoting a portion of the California Rancheria Act's legislative history that characterizes "the groups" occupying the Rancherias subject to the Act as "not well defined," Rancheria Act of August 18, 1958, Department of the Interior, Opinions of the Solicitor 1884 (Aug. 1, 1960) ("Solicitor Opinion"), J.A. 324, as well as a Senate Report stating that the North Fork had "no approved membership roll" in 1958, S. Rep. No. 85-1874, at 33 (1958), J.A. 306. Stand Up draws the wrong conclusion from the cited legislative history. That the Solicitor's opinion associated the Rancherias with groups that were "not well defined" is far less significant than that it associated them with "groups," thereby *supporting* the Department's conclusion that the North Fork Rancheria was connected to an identifiable North Fork tribal entity. Solicitor Opinion at 1884, J.A. 324. Likewise, that the North Fork failed to keep membership records in 1958 hardly undermines the Department's finding that the tribe existed at that time.

Finally, Stand Up argues that even if substantial evidence establishes the North Fork's 1958 existence, nothing connects the tribe's 1958 iteration to the voters in the North Fork Rancheria's 1934 section 18 election. Enough is enough! Stand Up demands an unnecessary—indeed impossible—genealogical exercise. Barring affirmative evidence of tribal discontinuity between 1934 and 1958, the Department was entitled to rely on the unremarkable assumption that a political entity, even as its membership evolves over time, retains its essential character.

**III.**

Now joined by the Picayune, Stand Up contends that, even if the Department had IRA authority to acquire trust land for the North Fork, it could not exercise that authority in connection with the North Fork's proposed casino project because the Department's determinations that the proposal complied with IGRA and the Clean Air Act were fatally flawed. We disagree.

**A.**

Although IGRA generally bars gaming on newly acquired Indian trust land, 25 U.S.C. § 2719(a), it creates an exception where the Department "determines that a gaming establishment on newly acquired lands [1] would be in the best interest of the Indian tribe and its members, and [2] would not be detrimental to the surrounding community," provided that "[3] the Governor of the State in which the gaming activity is to be conducted concurs in the [Department's] determination," *id.* § 2719(b)(1)(A). In this case, the Department made the required determinations, and California's governor concurred.

Neither Stand Up nor the Picayune disputes that the first of the exception's requirements—that the proposed casino is in the North Fork's best interests—was satisfied here. Instead, they challenge the Department's finding that "[t]he proposed Resort would not be detrimental to the surrounding community." IGRA Decision at 84, J.A. 3956. The Picayune also challenges the gubernatorial concurrence as invalid under California law.

Although the former argument requires some discussion, we can easily dispose of the latter, as it is twice forfeited. The district court concluded that the Picayune, having "nowhere in its ample briefing on summary judgment even mention[ed]" the gubernatorial concurrence's supposed invalidity, abandoned

any challenge to the concurrence. *Stand Up for California!*, 204 F. Supp. 3d at 247 n.16. The district court further ruled that no such challenge could proceed in any event, as California was not a party. *See id.* at 254. Because the Picyaune challenged neither of these independently dispositive findings in its opening brief, it has forfeited its opportunity to do so. *See Russell v. Harman International Industries, Inc.*, 773 F.3d 253, 255 n.1 (D.C. Cir. 2014) (argument not raised in opening brief on appeal is forfeited).

We turn, then, to the Department's non-detriment finding. Stand Up first attacks the Department for considering the casino's benefits as well as its detriments to the surrounding community, arguing that "benefits that are not connected to and will not mitigate [a] casino's undisputed detrimental impacts cannot simply cancel out those detrimental impacts." Stand Up Br. 37. As Stand Up sees it, IGRA's requirement that a casino "not be detrimental to the surrounding community," 25 U.S.C. § 2719(b)(1)(A), requires that a casino have no unmitigated negative impacts whatsoever, not that it, on balance, have a positive or at least neutral net effect on the surrounding community.

The district court rejected this "cramped reading" of IGRA, which, it found, "would result in barring any new gaming establishments," given that "[a]ll new commercial developments are bound to entail *some* [unmitigated] costs." *Stand Up for California!*, 204 F. Supp. 3d at 262 (first alteration in original) (quoting *Stand Up for California! v. U.S. Department of the Interior*, 919 F. Supp. 2d 51, 74 (D.D.C. 2013)). We do too. Stand Up points to nothing in IGRA that forecloses the Department, when making a non-detriment finding, from considering a casino's community benefits, even if those benefits do not directly mitigate a specific cost imposed by the casino. Indeed, Stand Up never even challenges IGRA

regulations that expressly allow the Department to consider "[*a*]*ny* . . . information that may provide a basis for a . . . [d]etermination whether the proposed gaming establishment would or would not be detrimental to the surrounding community." 25 C.F.R. § 292.18(g) (emphasis added); *see also id.* § 292.21(a) (cataloguing the information the Department is to consider). The Department reads this regulation as authorizing it to consider a casino's community benefits—even those that do not directly remediate a specific detriment—and we defer to this perfectly reasonable reading. *See Confederated Tribes of Grand Ronde*, 830 F.3d at 559 ("[W]e give substantial deference to an agency's interpretation of its own regulations unless it is contrary to the regulation[s'] plain language.").

Finding no defect in the Department's overall methodology, we move on to Stand Up's argument that the Department's non-detriment finding is unsupported by substantial evidence. Stand Up offers two reasons for this position, neither persuasive.

Stand Up first claims that the finding rests on an assumption that the North Fork will adopt mitigation measures set out in an environmental impact statement the Department prepared to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.* This assumption is untenable, Stand Up argues, because "NEPA imposes no substantive requirement that mitigation measures actually be taken." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 n.16 (1989). But even if NEPA itself imposes no such requirement, the North Fork signed memoranda of understanding (MOUs) with local governments, in which it agreed to undertake the contemplated measures. Stand Up insists that the Department could not rely on the MOUs as evidence that the North Fork would undertake mitigation because the MOUs, by their terms, would go into effect only

after the North Fork had entered a compact with California governing the terms of gaming at the proposed casino, and because the Department had no guarantee that such a compact would ever materialize. Unchallenged IGRA regulations, however, *obliged* the Department to consider the MOUs. *See* 25 C.F.R. § 292.18(g) (application to qualify for IGRA exception must contain information on "memoranda of understanding . . . with affected local governments"); *id.* § 292.21(a) (Department must consider this information). And it was reasonable for the Department to assume that the mitigation measures spelled out in the MOUs would take effect if necessary, even if the MOUs would not become binding absent a tribal-state compact. In most instances, such a compact is a statutory precondition to gaming on Indian land, *see* 25 U.S.C. § 2710(d)(1)(C), and, accordingly, a precondition to any casino-related harms the MOUs sought to mitigate. And although, absent a tribal-state compact, IGRA allows the Department to conditionally authorize gaming under prescribed conditions, *see id.* § 2710(d)(7)(B)(vii), the Department justifiably declined to allow its predictive judgment as to the casino's probable effects to be governed by the outside possibility that the North Fork would secure authorization to operate the casino without also abiding by the MOUs, *see Rural Cellular Association v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) ("The 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments . . . .").

Stand Up next argues that even with the mitigation measures in place, the Department lacked a sufficient basis for making a non-detriment finding because record evidence estimated that the casino would add 531 new problem gamblers to Madera County's adult population. Well aware of that consequence, the Department relied on the North Fork's promise to, among other things, cover the estimated $63,600

annual treatment costs attributable to new gamblers through an annual $50,000 earmarked contribution to Madera County and an additional catchall sum specifically calculated to cover the remaining $13,600. According to Stand Up, this mitigation does not address problem gamblers who never seek treatment, and the record suggests treatment "may," rather than "will," attenuate problem gambling in any event. U.S. Department of the Interior, Bureau of Indian Affairs, Final Environmental Impact Statement: North Fork Casino 4.7-9 (2009), J.A. 711. Perhaps so, but Stand Up has failed to show that any residual harms the North Fork's mitigation efforts leave unaddressed will be so substantial that the Department, permissibly viewing the casino's net effects holistically, was obliged to find that the casino would be detrimental.

The Picayune likewise focuses on a narrow subset of the casino's effects—specifically, the competitive threat to its own gaming operations. The Department acknowledged that it "must accord weight to [the] Picayune's concerns," IGRA Decision at 86, J.A. 3958, but due to "the relative proximity of [the] Picyaune's lands, headquarters, and existing class III gaming facility" to the site of the North Fork's proposed casino, *id.* at 85, J.A. 3957, it determined, pursuant to IGRA regulations unchallenged by the Picayune, that the tribe was not part of the "surrounding community," 25 C.F.R. § 292.2, and so assigned its concerns "less weight than comments submitted by communities and tribes that f[e]ll within the definition of 'surrounding community' in [the] regulations," IGRA Decision at 85, J.A. 3957. Appropriately weighed, the Department concluded, the proposed casino's competitive effects on the Picayune's own operations were insufficient to mandate a finding that the casino would be detrimental to the surrounding community. *See id.* The Picayune raises three challenges to the Department's reasoning.

First, the Picayune argues that the Department erred in concluding that it was not part of the surrounding community. But under IGRA regulations—again unchallenged by the Picyaune—"[s]urrounding community means local governments and nearby Indian tribes located within a 25-mile radius of the site of the proposed gaming establishment," 25 C.F.R. § 292.2, and the Picayune concedes that it is located outside the relevant 25-mile radius, Picayune Br. 12 n.1. Insisting that it nonetheless constitutes part of the surrounding community, the Picayune cites a portion of the IGRA regulation that allows a "nearby Indian tribe located beyond the 25-mile radius" to "petition for consultation if it can establish that its governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment." 25 C.F.R. § 292.2. Specifically, it contends that the Department, in finding that "the relative proximity of [the] Picayune's lands, headquarters, and existing . . . gaming facility to the [proposed casino's] Site" counseled in favor of considering the Picayune's concerns, IGRA Decision at 85, J.A. 3957, necessarily concluded that its "governmental functions, infrastructure or services will be directly, immediately and significantly impacted by" the North Fork's casino, 25 C.F.R. § 292.2, and so was obliged to treat it as part of the surrounding community.

The Picayune has given us no basis for upsetting the Department's reasonable interpretation of its own regulation as excluding from the "surrounding community" all communities outside the 25-mile radius—even those that may otherwise petition for consultation. *See Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (deferring to agency interpretation of its own regulation unless the interpretation is "plainly erroneous or inconsistent with the regulation" (quoting *Udall v. Tallman*, 380 U.S. 1, 16 (1965))). This interpretation follows readily from the regulation's text and, contrary to the

Picayune's argument, comports with the Department's characterization—in commentary contemporaneous with the regulation's promulgation—of the 25-mile radius as a "rebuttable presumption." Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354, 29,357 (May 20, 2008). A community outside the radius may, by showing that it will be "directly, immediately and significantly impacted by" a casino, rebut the presumption that it is not entitled to consultation, even while remaining outside the "surrounding community." 25 C.F.R. § 292.2.

Second, the Picyaune argues that even if the Department properly considered it to be outside the "surrounding community," nothing in IGRA's regulations "hints at the [Department] having any discretion to discount the weight" afforded to input from any community included in the consultation process. Picayune Br. 30. Contrary to the tribe's improbable assumption, however, nothing in the regulations so much as suggests that the Department must treat differently situated communities identically. To be sure, a casino might have substantial effects on even far-flung communities, but Congress was concerned only with the "surrounding community," 25 U.S.C. § 2719(b)(1)(A), and given Congress's choice to speak in geographic terms, the Department reasonably concluded that "[t]he weight accorded to the comments of tribes and local governments outside the definition of 'surrounding community' will naturally diminish as the distance between their jurisdictions and the proposed off-reservation gaming site increases," IGRA Decision at 86, J.A. 3958.

Lastly, the Picayune claims that the Department ignored evidence that competition from the North Fork's proposed casino would reduce its revenues, causing job loss and reduced public services. Expressly acknowledging this evidence, the

Department nonetheless concluded that because the Picayune's casino "has proven to be a successful operation in a highly competitive gaming market," any "competition from the [North Fork] Tribe's proposed gaming facility in an overlapping gaming market is not sufficient, in and of itself, to conclude that it would result in a detrimental impact to [the] Picayune." *Id.* Contrary to the Picayune's suggestion, the Department did not discount an anticipated competitive injury merely because "the source of the injury was competition," Picayune Br. 34; instead, the Department concluded that the Picayune's casino could successfully absorb the expected competitive effects. Given the reduced weight the Department permissibly assigned the Picayune's concerns, it concluded—appropriately in our view—that the casino's potential effects on the tribe were insufficient to render the casino detrimental to the surrounding community overall.

**B.**

Rounding out the bevy of challenges to the predicate determinations underlying the trust decision, Stand Up attacks the Department's finding that the proposed casino project conformed to California's plan for achieving compliance with federal air quality standards under the Clean Air Act. *See* 42 U.S.C. § 7410 (describing requirements for state implementation plans for achieving air quality standards); *id.* § 7506(c) (placing "affirmative responsibility" on federal agency heads to ensure certain projects' conformity to the relevant state implementation plans prior to approval). The Department concedes that it is unable to prove that, prior to issuing its conformity determination in June 2011, it gave prior notice to each and every governmental and tribal entity entitled to such notice as required by Clean Air Act regulations. *See* 40 C.F.R. § 93.155(a) (listing entities entitled to notice). When this defect was first brought to the district court's attention, it responded by allowing a limited remand, without vacatur, so

that the Department could belatedly issue the required notice and consider any responsive comments. *See Stand Up for California!*, 204 F. Supp. 3d at 236. After taking these steps in 2014, the Department reissued its original determination unchanged.

Stand Up argues that the Department's notice violation was incapable of after-the-fact cure and so required the district court to vacate the conformity determination. In initially granting remand without vacatur, however, the district court observed that the procedural flaw was minimal because the Department had given prior public notice of its determination in 2011, as well as specific notice targeting the entities "most likely to have substantive comments," and because "the much broader Environmental Impact Statement required under the [NEPA] was widely publicized and heavily commented upon." *Stand Up for California! v. U.S. Department of the Interior*, No. 12-2039, 2013 WL 12203229, at *3 & n.2 (D.D.C. Dec. 16, 2013). Given the notice defect's relative insignificance, as well as the potentially "disruptive consequences" of rolling back an essential predicate to the trust decision, the district court acted well within its discretion in finding vacatur unnecessary to address any harm the defect had caused. *Sugar Cane Growers Co-operative of Florida v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) ("[T]he decision whether to vacate depends on 'the seriousness of the order's deficiencies . . . and the disruptive consequences of an interim change that may itself be changed.'" (quoting *Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*, 988 F.2d 146, 150–51 (D.C. Cir. 1993))); *see also State of Nebraska Department of Health & Human Services v. Department of Health & Human Services*, 435 F.3d 326, 330 (D.C. Cir. 2006) (reviewing district court's choice of equitable remedy for abuse of discretion).

Stand Up contends that "[e]ven if the district court could properly remand without vacating the [Department's] initial [conformity determination], the [Department's] actions on remand—which treated the notice as perfunctory and simply rubber-stamped [its] earlier decision—were inadequate to meet the Clean Air Act's requirements." Stand Up Reply Br. 23. But in ordering remand without vacatur, the district court considered it "substantially likely" that the Department would "reach the same conclusion and reinstitute the same action" on remand, given that the Department had initially made the conformity determination only after considerable participation from multiple stakeholders. *Stand Up for California!*, 2013 WL 12203229, at *3. Stand Up identifies no new facts or considerations raised on remand that required the Department to part ways with its earlier conclusion.

Finally, Stand Up argues that the conformity determination, contrary to EPA regulations, was not "based on the latest and most accurate emission estimation techniques," 40 C.F.R. § 93.159(b), and in particular on "the most current" available motor vehicle emissions model specified by the agency, *id.* § 93.159(b)(1). When first issued in 2011, the determination here undisputedly complied with this requirement. But because EPA updated the relevant emissions model for California in 2013, *see* Official Release of EMFAC2011 Motor Vehicle Emission Factor Model for Use in the State of California, 78 Fed. Reg. 14,533 (Mar. 6, 2013), Stand Up argues that the Department, when reissuing the 2011 conformity determination on remand in 2014, should have done its calculations in accordance with the 2013 emissions model.

The parties dispute whether the reissued conformity determination falls into a regulatory safe harbor that allows "[c]onformity analyses for which the analysis was begun [three

months after] or no more than 3 months before" announcement of a new emissions model to rely on the prior model. 40 C.F.R. § 93.159(b)(1)(ii). We need not address this issue, however, because the relevant date for compliance with the regulatory emissions modeling requirement was 2011, when the Department initially made its conformity determination. Although the determination was subject to a limited remand on an unrelated notice issue, it was never vacated. In withholding vacatur, the district court expressly rejected Stand Up's "argument that the remand should require the [Department] to perform the entire Clean Air Act conformity determination again," *Stand Up for California!*, 2013 WL 12203229, at *4, instead viewing the remand as giving the Department an opportunity to "remedy a minor procedural defect," *id.* at *1. As we have already concluded, the district court acted well within its discretion in determining that the appropriate remedy for the Department's notice violation was a narrow remand for a single purpose. Under such circumstances, the Department had no obligation to rebuild the conformity determination from the ground up. *Cf. Allied-Signal*, 988 F.2d at 151 (agency need not refund fees collected under an inadequately supported rule where district court remands without vacatur to allow agency to "develop a reasoned explanation based on an alternative justification").

To be clear, we agree with Stand Up that an agency "is bound to enforce administrative guidelines in effect when it takes final action." *Sierra Club v. EPA*, 762 F.3d 971, 980 (9th Cir. 2014). Here, the Department's "final action" took place in 2011 and complied fully with the relevant regulatory requirement. Since then, the Department has done nothing more than ratify that final action in response to a narrow remand order that not only declined to vacate the 2011 conformity determination, but also affirmatively found it unnecessary for the agency to redo its prior analysis.

## IV.

After reviewing thousands of pages of evidence over the span of seven years, the Interior Department took the tract of land at issue into trust for the North Fork and approved the tribe's proposed casino. Viewing the same extensive record and affording the appropriate measure of deference to the Department's supportable judgments, we, like the district court, conclude that this decision was reasonable and consistent with applicable law. We affirm.

*So ordered.*