# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 22, 2020            Decided June 16, 2020

No. 18-5145

AMERICAN GREAT LAKES PORTS ASSOCIATION, ET AL.,
APPELLANTS

v.

KARL L. SCHULTZ, IN HIS OFFICIAL CAPACITY AS
COMMANDANT, UNITED STATES COAST GUARD, ET AL.,
APPELLEES

Consolidated with 18-5167

Appeals from the United States District Court
for the District of Columbia
(No. 1:16-cv-01019)

*C. Jonathan Benner* argued the cause for appellants. With him on the briefs was *Michael E. Deutsch. Kayla Grant* entered an appearance.

*Jane M. Lyons*, Assistant U.S. Attorney, argued the cause for federal appellees. With her on the brief were *Jessie K. Liu*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Jeremy S. Simon*, Assistant U.S. Attorney, entered an appearance.

*John Longstreth* argued the cause for intervenor-appellees. With him on the brief was *Mark Ruge*.

Before: SRINIVASAN, *Chief Judge*, and ROGERS and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: Ships engaged in foreign trade on the Great Lakes must use pilots registered pursuant to the Great Lakes Pilotage Act of 1960. The Coast Guard administers this licensing monopoly and sets rates for the American pilots, which has resulted in ongoing disputes between the Pilots and the Great Lakes commercial shipping and port interests ("Shippers"). This case requires us to resolve an Administrative Procedure Act challenge by the Shippers to the pilot rates for the 2016 commercial shipping season ("2016 Rule"). The Shippers claim the 2016 Rule set an artificially inflated pilot rate that caused significant harm to the industry. The district court upheld parts of the 2016 Rule setting higher compensation targets for the Pilots, but held several parts of the Rule to be unsupported by the administrative record and remanded to the Coast Guard without vacating the Rule. We affirm the district court's decision in full. Although remand without vacatur is the exception rather than the rule, in these circumstances, the district court acted within its discretion, given the disruption likely to occur from reallocating rates paid several years ago.

I.

The Great Lakes Pilotage Act requires foreign vessels and American vessels participating in foreign trade to hire an American or Canadian maritime pilot to assist in navigating the

difficult waters of the Great Lakes. *See* 46 U.S.C. §§ 9301–9308. The Act authorizes the Coast Guard to certify pilots, establish conditions of service, and set the rates that pilots must charge for their services. *See* 46 U.S.C. § 9303. Pursuant to this statutory authority, the Coast Guard has certified three pilotage associations to be the exclusive American providers of Great Lakes pilotage services in their assigned regions. *See* 81 Fed. Reg. 11,908, 11,910 (Mar. 7, 2016). When setting rates, the Coast Guard must consider "the public interest and the costs of providing the services." 46 U.S.C. § 9303(f). The Coast Guard must "establish new pilotage rates by March 1 of each year," *id.*,[1] which the agency does through notice and comment rulemaking.

After requests from the Pilots and Shippers, the Coast Guard proposed a new methodology to calculate Great Lakes pilot rates for the 2016 shipping season. The Coast Guard's proposed rule was based largely upon the recommendations of the Great Lakes Pilotage Advisory Committee (GLPAC), an entity created by Congress in 1983 for the purpose of assisting the Coast Guard in formulating rates. *See* 80 Fed. Reg. 54,484, 54,486 (Sept. 10, 2015); 46 U.S.C. § 9307(d)(2) ("The Secretary shall consider the information, advice, and

---

[1] 46 U.S.C. § 9303(f) reads in full:

> The Secretary shall prescribe by regulation rates and charges for pilotage services, giving consideration to the public interest and the costs of providing the services. The Secretary shall establish new pilotage rates by March 1 of each year. The Secretary shall establish base pilotage rates by a full ratemaking at least once every 5 years and shall conduct annual reviews of such base pilotage rates, and make adjustments to such base rates, in each intervening year.

recommendations of the Committee in formulating policy regarding matters affecting Great Lakes pilotage."). The agency identified two reasons for changing the methodology. First, both the Pilots and the Shippers identified methodological issues that distorted the ratemaking calculation. The Pilots argued that the methodology resulted in artificially low rates that made it difficult to attract and retain pilots (harming "the public interest") and the Shippers argued that the rates were artificially inflated (ignoring "the costs of providing the services"). *See, e.g.*, 80 Fed. Reg. at 54,486. Second, the Coast Guard previously relied on union compensation data for similarly situated merchant marine masters and mates to help determine target pilot compensation; however, such data was no longer available from the union. *See id.* at 54,484.

After the public comment period, the Coast Guard finalized the 2016 Rule largely along the lines initially proposed and consistent with the GLPAC recommendations. 81 Fed. Reg. at 11,908. In adopting a new methodology, the Coast Guard found that the prior ratesetting undercompensated pilots, which resulted in pilot shortages and threats to vessel safety. The agency concluded rates must be increased to ensure a well qualified pool of pilots. *Id.* at 11,910. The new methodology was designed "to generate sufficient revenue for the pilots to provide the service [the public] require[s]." *See id.* at 11,909. To accomplish this, the Coast Guard, as relevant to this appeal, switched to the Peak Staffing Model, which pegged the number of necessary pilots to peak traffic periods in order to ensure the availability of rested pilots at all times. *See* 80 Fed. Reg. at 54,489; 81 Fed. Reg. at 11,908–909. The agency also employed Canadian pilot compensation as a benchmark for compensation, plus a ten percent cost of living upward adjustment to incentivize American pilots to remain in the Great Lakes region. 81 Fed. Reg. at 11,914–915. Finally, the

Coast Guard estimated the rule would cost the shipping industry an additional $1.87 million annually, as well as a one-time $1.65 million expense to cover training. *Id.* at 11,937–38.

The Shippers, represented by the American Great Lakes Ports Association, filed a lawsuit challenging the 2016 Rule under the Administrative Procedure Act in the United States District Court for the District of Columbia. The Shippers disputed the overall justification for the new methodology, questioning the agency's conclusion that there was a compensation-driven pilot shortage in the Great Lakes region that could be remedied by increasing pilot rates. They also challenged the Coast Guard's failure to consider "weighting factors"[2] in the methodology; the setting of American pilot rates using Canadian pilot compensation with a ten percent upward adjustment; and the use of the new Peak Staffing Model to calculate rates.

The district court rejected the Shippers' overarching challenge to the Coast Guard's new methodology. *See Am. Great Lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 3d 27, 39–41 (D.D.C. 2017). As an initial matter, the court held the Coast Guard's decision to increase rates was not arbitrary and capricious because it rested on sufficient record evidence "even absent the empirical evidence demanded by Plaintiffs." *Id.* at 39–41. The court also affirmed the Coast Guard's use of the Peak Staffing Model to determine the number of rested pilots

---

[2] Weighting factors "are multipliers that are used by pilotage associations to calculate the actual pilotage fees that the associations will charge for any given voyage. In essence, the larger the vessel, the higher the weighting factor, and the more the pilotage associations can charge." *Am. Great Lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 3d 27, 35 n.5 (D.D.C. 2017). The Shippers contended that the Coast Guard's failure to account for these factors artificially inflated the pilot rates.

needed throughout the season because one of the agency's rationales—safety—was "amply supported" by the record. *Id.* at 42–43. The court, however, held two aspects of the Coast Guard's new methodology to be unsupported by the record. First, the court held there was no reasoned basis for setting American pilot compensation by reference to a ten percent increase over the base Canadian compensation rate because the figure came from unidentified comments during a GLPAC meeting. *Id.* at 46–48. Second, the court held that the Coast Guard acted arbitrarily by failing to account for increased pilot revenue from vessel weighting factors, resulting in a potential overcharge to the Shippers. *Id.* at 51–52. Noting the difficulty of crafting a remedy, the district court instructed the parties to file supplemental briefing on the appropriate remedy. *Id.* at 56.

Following additional briefing, the district court determined, in a separate published opinion, that remand without vacatur was the appropriate remedy. *See Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 104–05 (D.D.C. 2018). The Shippers urged the court to vacate the 2016 Rule and order various forms of prospective and retroactive relief to compensate for the unlawfully inflated rates. *Id.* at 102. The district court noted the Shippers' requests demonstrated they "fundamentally misunderstand th[e] Court's prior ruling" because the court had not held that the rates were too high, but instead that the rates were not justified by the administrative record. *Id.* The court found the errors in the 2016 Rule were substantial because the Coast Guard provided no support for pegging compensation to Canadian pilots or for its failure to include weighting factors (which were included in the 2017 rate review). *Id.* at 103. Although the court determined the Coast Guard's errors to be significant, it remanded without vacatur because the "disruptive consequences" of vacatur outweighed the seriousness of the errors. *Id.* at 103–05. The court noted it was unclear "whether and to what extent the

pilotage associations might be required to issue refunds" in response to vacatur but that "to the extent that they would be required to do so, the disruptive consequences are clear." *Id.* at 104. The court thus remanded to the Coast Guard to "evaluate and justify an appropriate adjustment to benchmark compensation for its ratemaking methodology going forward." *Id.* at 105.

The Shippers appeal, arguing the district court erred in affirming parts of the 2016 Rule and further abused its discretion in declining to vacate the Rule despite finding significant parts of it unsupported by the record.

II.

As an initial matter, this court must assure itself that it has jurisdiction over the Shippers' appeal of the district court's remand order. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). The courts of appeals have jurisdiction over "all final decisions of the district courts of the United States," 28 U.S.C. § 1291, and "[a] remand order usually is not a final decision," *NAACP v. United States Sugar Corp.*, 84 F.3d 1432, 1436 (D.C. Cir. 1996). We have noted, however, that "[t]he requirement of finality is to be given a practical rather than a technical construction." *Limnia, Inc. v. Dep't of Energy*, 857 F.3d 379, 385 (D.C. Cir. 2017) (internal quotation marks omitted). A remand order "that terminate[s] an action fall[s] within the core of Section 1291's requirement of finality." *Id.* (internal quotation marks omitted).

Here, the district court's remand order effectively terminates the Shippers' action. This appeal presents the only opportunity for the Shippers to challenge the remand order. Although "a remand for significant further proceedings" generally constitutes a nonfinal order, *Pueblo of Sandia v. Babbitt*, 231 F.3d 878, 881 (D.C. Cir. 2000), the remand order

under review does not instruct the Coast Guard to reopen the 2016 rate review and conduct further proceedings. *See Am. Great Lakes Ports Ass'n*, 301 F. Supp. 3d at 105. The order thus finally disposed of the Shippers' APA challenges to the 2016 Rule. *See In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d 629, 633 (D.C. Cir. 2014) ("[T]reating the district court's remand order as unappealable would effectively preclude … plaintiffs from ever challenging the district court's decisions." (internal quotation marks omitted)). Moreover, it is relevant, although not dispositive, *see Limnia*, 857 F.3d at 386, that the district court characterized its remand order as "a final appealable Order." J.A. 119. In sum, we have jurisdiction over the Shippers' appeal under 28 U.S.C. § 1291.

## III.

Turning to the merits, the Shippers challenge the Coast Guard's determination that a compensation-driven pilot retention crisis necessitated increased rates and that the Peak Staffing Model should be used to calculate rates. We review such challenges "*de novo*, evaluating the administrative record directly and invalidating the [agency's] actions only if, based on that record, they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Stand Up for California! v. Dep't of Interior*, 879 F.3d 1177, 1181 (D.C. Cir. 2018) (internal quotation marks omitted).

## A.

The Shippers first challenge the Coast Guard's finding that a compensation-driven pilot shortage was developing on the Great Lakes, endangering both safety and efficient commerce. We agree with the Coast Guard that the record contains ample evidence of a pilot shortage on the Great Lakes and that the shortage was caused by low compensation.

As to the shortage, the Coast Guard explained that the number of pilots has decreased significantly, with thirty-one pilots leaving the system. The rate of attrition has exceeded the rate of replacement, resulting in a net decrease of twenty-two percent, from forty-four to thirty-six pilots in less than a decade. *See* 81 Fed. Reg. at 11,919. The 2016 Rule includes abundant evidence that this decline has brought pilot numbers below acceptable levels, impairing the safety of Great Lakes navigation. *See, e.g.*, *id.* at 11,918–921.

The agency also cited significant evidence demonstrating that low compensation drove this pilot shortage. For instance, comments from affected individuals and entities supported the Coast Guard's conclusion that compensation was a key factor in the retention and recruitment of pilots. Former pilots and trainees stated they "resigned because of low pay and long hours." 81 Fed. Reg. at 11,919. Hiring agents noted that "low compensation and long hours … kept many highly qualified mariners from signing on as pilots." *Id.* Finally, one pilot commented that "10 pilots in his association took early retirement to escape the low compensation and long hours." *Id.* The administrative record thus indicated that the Great Lakes have a "retention and attraction problem" because its pilots are "the lowest paid pilots in America" and "have the highest workload in America." J.A. 468 (statement from Pilots' representative at GLPAC meeting).

The Shippers primarily challenge the agency's reliance on public comments, rather than empirical evidence. Appellant Br. 37–40. The APA, however, "imposes no general obligation on agencies to produce empirical evidence." *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009). The Coast Guard's heavy reliance on comments was legitimate in this proceeding. The Great Lakes pilotage labor market is small—approximately thirty-six pilots—and the agency

received comments from a large segment of current and former pilots, who consistently cited compensation as a leading reason for the pilot shortage. *See* 81 Fed. Reg. at 11,917–920. "A degree of agency reliance on [comments from affected parties] is not only permissible but often unavoidable." *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1124 (D.C. Cir. 1984). The Shippers provide no contrary evidence, empirical or otherwise, to suggest these firsthand accounts are not representative of pilots at large. "[A]n agency need not—indeed cannot—base its every action upon empirical data; depending upon the nature of the problem." *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005). It was entirely reasonable for the agency to rely on reasons provided by the hiring agents, pilots, and former pilots to determine that an increase in compensation would aid retention and recruitment of Great Lakes pilots.

Moreover, the Coast Guard's conclusion that compensation is a major cause of the shortage was supported by the recommendations of the Great Lakes Pilotage Advisory Committee (GLPAC). *See* 80 Fed. Reg. at 54,486; 81 Fed. Reg. at 11,911 (citing GLPAC recommendation). Congress directed that the Coast Guard "shall consider" GLPAC's recommendations, 46 U.S.C. § 9307(d)(2), and here GLPAC unanimously recommended many aspects of the methodology the agency adopted in the 2016 Rule. *See* 80 Fed. Reg. at 54,486. In addition, the agency relied upon an expert evaluation in the Coast Guard-commissioned Bridge Hour Study, which identified growing concern "regarding the available candidate pool to replace pilots who will soon be retiring" and cited inadequate pay "as a leading issue" alongside "stability of pay," "quality of life," and other issues. J.A. 495; 81 Fed. Reg. at 11,908.

11

The administrative record thus included a wealth of evidence supporting the agency's conclusion that if it "fail[ed] to implement this methodology and new rates, … the pilot associations will not be able to recruit experienced mariners and retain their registered pilots." 81 Fed. Reg. at 11,925; *cf. FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978) ("[C]omplete factual support in the record for the [agency's] judgment or prediction is not possible or required; a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency." (internal quotation marks omitted)). In sum, the Coast Guard reasonably concluded that "increased pilot rates are the best and quickest way to attract and retain more qualified pilots." 81 Fed. Reg. at 11,921.

B.

The Shippers also challenge the Peak Staffing Model as arbitrary and capricious. Part of the Coast Guard's new ratesetting methodology, the Model seeks to ensure the pilot rate is sufficient to cover the cost of employing "the number of pilots needed to meet each shipping season's peak pilotage demand periods without interruption to service." 80 Fed. Reg. at 54,489. In the 2016 Rule, the Coast Guard predicted the Model would reduce delays caused by insufficient staffing and also increase safe pilotage practices. *See* 81 Fed. Reg. at 11,922. The district court found the delay rationale "inconclusive" but could not "say that the evidence necessarily runs counter to the Coast Guard's conclusion." *Am. Great Lakes Ports Ass'n*, 296 F. Supp. 3d at 42. The court, however, found the record "amply supported the Coast Guard's conclusion that greater staffing levels were needed to improve safe pilotage on the Great Lakes." *Id.* at 43. The Shippers

maintain that the Coast Guard's explanation for its reliance on the Model is inadequate.

We find that the agency adequately supported the Peak Staffing Model on the grounds that it furthered safe pilotage. When setting rates, the Coast Guard must consider "the public interest," 46 U.S.C. § 9303(f), and this court has interpreted the public interest to include safe pilotage. *See Menkes v. DHS*, 637 F.3d 319, 334 (D.C. Cir. 2011); *accord id.* at 351 (Brown, J., dissenting in part) (noting that the text and structure of the Act "promotes maritime safety"). The Coast Guard concluded the Peak Staffing Model is necessary to ensure there are enough pilots on hand throughout the season to cover surge periods. *See* 81 Fed. Reg. at 11,922. Without pegging staffing needs to the peak periods, which may occur anytime during the season, situations will inevitably arise in which pilots will have to forgo the necessary rest periods recommended by the National Transportation Safety Board ("NTSB"). *See id.* ("Setting pilot numbers high enough to accommodate all these peak periods is essential … to provide the recuperative monthly rest periods recommended by the NTSB in the interests of safety."). Citing multiple reports, commenters, and the NTSB recommendation, the agency's decision rests on an ample record supporting the conclusion that the shortage of rested pilots endangered safety. *See, e.g.*, 81 Fed. Reg. at 11,918–922. Although the record does not support the reducing delay rationale,[3] the public safety

---

[3] Like the district court, we find the record inconclusive regarding a correlation between delays and staffing levels. The Coast Guard's support for the delay rationale consists of a series of charts comparing pilot staffing levels and delay hours. 81 Fed. Reg. at 11,920–921. The charts compare only two variables, pilot staffing and delay hours, and fail to demonstrate a correlation between the two. *See id.* The Coast Guard acknowledged that "[o]ther factors contribute to delays," but provided no analysis of the various factors that cause delays. *Id.* at 11,921.

rationale provides an independent and sufficient reason for the Peak Staffing Model.

In lieu of the Peak Staffing Model, which required maintaining a greater number of pilots at all times, the Shippers assert that part time contractors could supplement full time Great Lakes pilots during peak periods. Yet the Coast Guard specifically determined this alternative would be unsafe because contract pilots would not have knowledge of local waters and weather conditions in the Great Lakes and could not gain the necessary experience on short notice. *See* 81 Fed. Reg. at 11,922. Moreover, the agency explained that other pilotage systems are not proper comparators because "those systems cover smaller areas in which those pilots more easily can maintain the necessary knowledge without impacting safety." *Id.* With ample record evidence, we decline to second guess the Coast Guard's expertise over maritime safety and uphold the use of the Peak Staffing Model.

## IV.

The Shippers prevailed below in their challenges to the failure to consider weighting factors and to the use of an upwardly adjusted Canadian benchmark for target pilot compensation. *See Am. Great Lakes Ports Ass'n*, 301 F. Supp. 3d at 101. Neither the Coast Guard nor the Pilots attempt to defend these aspects of the 2016 Rule on appeal.[4] The Shippers,

---

[4] In subsequent rate adjustments, the Coast Guard addressed both issues by including weighting factors in the calculation and by pegging target compensation to union data (available from earlier years) adjusted for inflation and Great Lakes conditions, rather than the Canadian pilots' compensation. *See* 84 Fed. Reg. 20,551, 20,553 (May 10, 2019) ("In 2017, we added … new steps that accurately account for the … weighting factors …. In 2018, we revised the methodology by which we develop the compensation benchmark.").

however, argue that the district court's decision to remand without vacatur was an abuse of discretion because it effectively precludes the Shippers from obtaining relief from the agency's arbitrary and capricious action.

Although "vacatur is the normal remedy" under the APA, our precedents permit a court to remand without vacating the agency's action in limited circumstances. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). To determine whether to remand without vacatur, this court considers first, "the 'seriousness of the [action's] deficiencies,'" and, second, the "likely 'disruptive consequences' of vacatur." *Id.* (quoting *Allied-Signal, Inc. v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). The Coast Guard and Pilots do not dispute the seriousness of the errors on appeal, and so we see no need to disturb the district court's finding. *See Am. Great Lakes Ports Ass'n*, 301 F. Supp. 3d at 103 ("[T]he Court cannot conclude that the defects in the Coast Guard's 2016 Rule were not serious."). We focus on the parties' main point of contention, namely the district court's assessment of the disruptive consequences that would flow from vacating the 2016 Rule.

The Shippers contend that the district court could "easily remedy" the error by "ordering a review and repricing of the invoices from the Pilotage Associations to the shipping companies under the rates established under the prior 2015 Rule." Appellant Br. 49. Yet the district court identified

This controversy remains live, however, because the agency has not attempted to compensate the Shippers for potential overcharges caused by the errors in the 2016 Rule. *Cf. Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 210 (D.C. Cir. 2011) ("[S]ince the 2008 rule in no way compensated for any underpayments that might have been made in 2007, a live controversy remains regarding the hospitals' objection to the 2007 rule.").

numerous disruptive consequences that would follow from vacating the 2016 Rule. Our review comes nearly four years after rates have been paid in reliance on the 2016 Rule. As the district court found, vacatur would mean that "every payment that was made in the 2016 season was erroneous," *Am. Great Lakes Ports Ass'n*, 301 F. Supp. 3d at 104, and may involve the Coast Guard and the Shippers attempting to recoup and redistribute funds that changed hands years ago in numerous separate transactions. *Cf. Milk Train v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002) (noting disruptive consequences from attempting to retrieve funds erroneously disbursed and likely invested by the recipients because "those moneys may not be recoverable three years later"). Further, the precise amount of each refund would be unclear given the lack of an operative 2016 rate. *See Am. Great Lakes Ports Ass'n*, 301 F. Supp. 3d at 104.

Under our precedents, a quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome. We have rejected approaches similar to the Shippers' proposed reinvoicing as "an invitation to chaos." *Sugar Cane Growers v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002). More generally, although remand without vacatur remains an exceptional remedy, we have held that it is appropriate when vacatur would disrupt settled transactions. *See Milk Train*, 310 F.3d at 756; *Sugar Cane Growers*, 289 F.3d at 97 ("The egg has been scrambled and there is no apparent way to restore the status quo ante."). Because the district court acted within our precedents and its remedial discretion, we affirm its order remanding the 2016 Rule to the agency without vacatur. *Cf. Stand Up for California!*, 879 F.3d at 1190 (holding that "the district court acted well within its discretion in finding vacatur unnecessary to address any harm the defect had caused").

We recognize that a remand without vacatur does not provide the Shippers with the complete relief they sought, and agencies often delay or decline to take action in these circumstances. *See In re Core Commc'ns, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) ("[E]xperience suggests that [remand without vacatur] sometimes invites agency indifference."). The limits of a judicial remedy here stem in part from this particular statutory scheme, which requires the Coast Guard to review and adjust pilot rates annually. By the time an appeal winds its way to us, the egg will often be scrambled, leaving us with few options other than telling the Coast Guard, in effect, to "try better next time."[5] In its next annual rate review, the agency should consider if it has the statutory authority to remedy the harms from the 2016 Rule and if doing so would comport with its mandate to consider "the public interest and the costs of providing the services." 46 U.S.C. § 9303(f).[6]

---

[5] Government ratesetting in this regulatory program frequently leaves either the Pilots or Shippers dissatisfied. As one district court recently observed, "each year, it seems, either the shipping companies or the associations that supply the pilots sue the Coast Guard to challenge aspects of the rulemaking. The shippers perennially complain that the rates are too high, while the pilots gripe that they are too low." *Am. Great Lake Ports Ass'n v. Coast Guard*, 18-cv-2650, 2020 WL 1157028, at *1 (D.D.C. Mar. 10, 2020); *see also St. Lawrence Seaway Pilots Ass'n v. Coast Guard*, 357 F. Supp. 3d 30 (D.D.C. 2019); *St. Lawrence Seaway Pilots Ass'n, Inc. v. Coast Guard*, 85 F. Supp. 3d 197 (D.D.C. 2015).

[6] At oral argument, the government suggested the agency could account for potential overcharges to the Shippers in a future rate adjustment. *See* Oral Arg. 27:40–29:35. We take no position on whether the Great Lakes Pilotage Act provides the Coast Guard with the authority to take such an action.

\* \* \*

For the foregoing reasons, we affirm the district court's decision in full.

*So ordered.*