**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CACHIL DEHE BAND OF WINTUN INDIANS OF THE COLUSA INDIAN COMMUNITY, a federally recognized Indian Tribe,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>RYAN K. ZINKE, Secretary of the Interior; KEVIN K. WASHBURN, Esquire, Assistant Secretary of the Interior - Indian Affairs; MICHAEL S. BLACK, Director, United States Bureau of Indian Affairs; AMY DUTSCHKE, Director, Pacific Region, Bureau of Indian Affairs; ESTOM YUMEKA MAIDU TRIBE OF THE ENTERPRISE RANCHERIA, CALIFORNIA; BUREAU OF INDIAN AFFAIRS; DEPARTMENT OF THE INTERIOR,<br>*Defendants-Appellees.* | No. 17-15245<br><br>D.C. No. 2:12-cv-03021-TLN-AC |

| | |
|---|---|
| CITIZENS FOR A BETTER WAY; STAND UP FOR CALIFORNIA!; GRASS VALLEY NEIGHBORS; WILLIAM F. CONNELLY; JAMES M. GALLAGHER; ANDY VASQUEZ; DAN LOGUE; ROBERTO'S RESTAURANT; ROBERT EDWARDS, *Plaintiffs-Appellants*, | No. 17-15533 D.C. No. 2:12-cv-03021-TLN-AC |
| v. | OPINION |
| RYAN ZINKE, Secretary of the Interior; KEVIN K. WASHBURN, Esquire, Assistant Secretary of the Interior - Indian Affairs; MICHAEL S. BLACK, Director, United States Bureau of Indian Affairs; AMY DUTSCHKE, Director, Pacific Region, Bureau of Indian Affairs; ESTOM YUMEKA MAIDU TRIBE OF THE ENTERPRISE RANCHERIA, CALIFORNIA; BUREAU OF INDIAN AFFAIRS; DEPARTMENT OF THE INTERIOR, *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Eastern District of California
Troy L. Nunley, District Judge, Presiding

Argued and Submitted February 12, 2018
San Francisco, California

Filed May 2, 2018

Before: Michael Daly Hawkins, Carlos T. Bea,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Bea

# SUMMARY[*]

## Tribal Affairs

The panel affirmed the district court's summary judgment in favor of the Estom Yumeka Maidu Tribe of the Enterprise Rancheria in an action seeking to enjoin the U.S. Department of the Interior's Bureau of Indian Affairs ("BIA") from taking a parcel of land into trust for Enterprise so that Enterprise could build a casino and hotel complex.

Following the BIA's decision to make the parcel acquisition, a nearby Indian Tribe with a casino of its own ("Colusa"), and various citizens' groups and individuals opposed to the construction of the Enterprise Casino, alleged errors in the regulatory process and sued to enjoin the acquisition.

The panel held that the Department of the Interior had the statutory authority under the Indian Reorganization Act to take land into trust for Enterprise. The panel further held that, pursuant to the Act's implementing regulations in 25 C.F.R. § 151.11(a), the Secretary properly considered Enterprise's "need" for the land. The panel also held that Interior's incorrect legal description of the parcel in the Federal Register was a trivial error that was quickly corrected, and did not render the final Record of Decision arbitrary and capricious.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected plaintiffs' challenges based on the Indian Gaming Regulatory Act. The panel held that the BIA properly consulted with Colusa. The panel rejected Colusa's facial and as-applied challenges to the implementing regulation, 25 C.F.R. § 292.3, which mandated consultation with communities within twenty-five miles of the proposed trust acquisition, and concluded that Colusa was given an opportunity to consult. The panel also held that the Secretary's finding that the proposed casino project would not be "detrimental to the surrounding community," 25 U.S.C. § 2719(b)(1)(A), was not arbitrary and capricious. The panel held that the district court did not err in striking a declaration, submitted by Colusa as extra-record evidence. In a matter of first impression, the panel found that it was within the expertise of the agency to determine the likelihood required mitigation measures will be followed, and the BIA's determination that Enterprise would fulfill its required mitigation measures was not arbitrary or capricious.

The panel rejected plaintiffs' challenges based on the National Environmental Policy Act. The panel held that the Final Environmental Impact Statement's "purpose and need" statement was not "artificially limited." The panel also held that Colusa waived any argument that Interior's failure to consider its proposed alternatives represented a NEPA violation. The panel further held that Colusa did not establish that the Final Environmental Impact Statement relied on inadequate or flawed data. The panel also held that the Statement took a "hard look" at the environmental impacts of the proposed action. Finally, the panel held that Colusa did not present any evidence that the BIA failed to engage in adequate independent oversight over the preparation of the Draft Environmental Impact Statement or the Final Environmental Impact Statement, or that the

consulting services Analytical Environmental Services may perform was in any way significant.

## COUNSEL

George Forman (argued), Jay B. Shapiro, and Margaret C. Rosenfeld, Forman & Associates, San Rafael, California, for Plaintiff-Appellant Cachil Dehe Band of Wintun Indians of the Colusa Indian Community.

Benjamin S. Sharp (argued) and Jennifer A. MacLean, Perkins Coie LLP Washington, D.C.; Brian Daluiso, Perkins Coie LLP, San Diego, California; for Plaintiffs-Appellants Citizens for a Better Way, Stand Up for California!, Grass Valley Neighbors, William F. Connelly, James M. Gallagher, Andy Vasquez, Dan Logue, Roberto's Restaurant, and Robert Edwards.

Mary Gabrielle Sprague (argued) and John L. Smeltzer, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; Appellate Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; for Federal Defendants-Appellees.

Matthew G. Adams (argued) and Jessica L. Duggan, Dentons US LLP, San Francisco, California; Michael S. Pfeffer and John A. Maier, Maier Pfeffer Kim Geary & Cohen LLP, Oakland, California; for Defendants-Appellees Estom Yumeka Maidu Tribe of the Enterprise Rancheria, California.

Frank R. Lawrence and Zehava Zevit, Law Office of Frank Lawrence, Grass Valley, California, for Amicus Curiae Mooretown Rancheria of Maidu Indians of California.

---

**OPINION**

BEA, Circuit Judge:

On July 15, 2003, the Estom Yumeka Maidu Tribe of the Enterprise Rancheria ("Enterprise") asked the Bureau of Indian Affairs (the "BIA"), a part of the United States Department of the Interior, to take a parcel of land into trust for them so that Enterprise could build a casino and hotel complex. In November 2012, after almost ten years of studies, expert reports, meetings, and other regulatory processing, the BIA agreed to the acquisition. Immediately following the BIA's decision, several entities, including the Cachil Dehe Band of Wintun Indians of the Colusa Indian Community ("Colusa"), a nearby Indian Tribe with a casino of its own, and various citizens' groups and individuals opposed to the construction of the Enterprise Casino (together, "Citizens"),[1] alleged a host of errors in the lengthy regulatory process and sued to enjoin the trust acquisition. The district court granted summary judgment in favor of Enterprise. For the reasons that follow, we affirm.

---

[1] This group of concerned citizens includes the groups Citizens for a Better Way, Stand Up For California!, and Grass Valley Neighbors; individuals William F. Connelly, James M. Gallagher, Andy Vasquez, Dan Logue, Robert Edwards; and the business Roberto's Restaurant.

I.

In 1915, a representative of the United States Indian Service visited Enterprise, California, and completed a census of fifty-one Indians "in and near Enterprise in Butte County, California." That same year, the United States purchased two forty-acre parcels of land in trust for Indians living in Enterprise: (1) Enterprise 1, located approximately ten miles northeast of Oroville, and (2) Enterprise 2, located closer to Oroville (together, the "Enterprise Rancheria"). The United States continues to hold Enterprise 1 in trust; however, in 1965, the State of California purchased Enterprise 2 and flooded it to allow the construction of the Oroville dam. The parties agree that since 1915 Indians have been living on the Enterprise Rancheria, and the Enterprise Rancheria is an Indian Reservation.

In 1934, Congress enacted the Indian Reorganization Act, 25 U.S.C. § 5108 et seq., (the "IRA"). Section 18 of the IRA states that the Act "shall not apply to any reservation wherein a majority of the adult Indians, voting at a special election duly called by the Secretary of the Interior, shall vote against its application." *Id.* § 5125. In due course, so-called Section 18 elections were held on Indian reservations around the country, including on Enterprise Rancheria on June 16, 1935.[2]

---

[2] Incidentally, the Indians in Enterprise voted *against* the application of the IRA. In 1983, Congress enacted the Indian Land Consolidation Act, Pub. L. No. 97-459, 96 Stat. 2517 (1983), which amended the IRA to provide that Section 5 of the IRA—the Section which allows for the taking of land into trust for Indians' benefit—would apply notwithstanding a tribe's rejection of the IRA pursuant to a Section 18 election.

In 1979, the Department of the Interior began to publish lists of federally recognized tribes in the Federal Register. The "Enterprise Rancheria of Maidu Indians" has appeared on each list from 1979 to the present.

On August 13, 2002, Enterprise submitted a "fee-to-trust" application to the Secretary of the Interior pursuant to the IRA, 25 U.S.C. § 5108, which authorizes the Secretary to take lands in trust for the benefit of "the Indian tribe or individual Indian for which the land is acquired." The application asked the Secretary to accept into trust forty acres of land owned by Yuba County Entertainment, L.L.C., (the "Yuba Site"), located in Yuba County, California, so Enterprise could develop an off-reservation casino and hotel.

There are a number of regulatory hurdles which must be vaulted to take land into trust for off-reservation gaming. While the IRA allows for the Secretary to take land into trust for the benefit of Indians, the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA") generally prohibits gaming on such lands taken into trust after October 17, 1988. However, gaming is permitted if the Secretary determines, after consulting with the "Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes," that the gaming would "not be detrimental to the surrounding community," and if the Governor of the relevant state agrees with the Secretary's determination. 25 U.S.C. § 2719(b)(1)(A). This is referred to as the Secretarial two-part determination.

In addition to satisfying IGRA, more regulatory hurdles remain. The Department of the Interior and the applicant Tribe must satisfy the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*, ("NEPA"). NEPA requires that all federal agencies considering actions "significantly affecting the quality of the human environment" prepare a "detailed

statement" describing the "environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," "alternatives to the proposed action," "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.* § 4332(C). The "detailed statement" is referred to as an Environmental Impact Statement (an "EIS").

These various statutory and regulatory requirements created a lengthy administrative process.

First, on August 13, 2002, Enterprise submitted its "fee-to-trust" application to the Secretary of the Interior. The application requested that Interior take title to the Yuba Site in trust so that the Tribe could build a 207,760 square foot casino and accompanying hotel. The application included a December 2001 document entitled "Gaming and Hotel Market Assessment: Marysville, California," prepared by The Innovation Group. The assessment evaluated ten market areas in northern California, analyzed the characteristics of other existing tribal casinos, and estimated revenues and expenses for a casino/hotel for 2004–2008.

Second, Enterprise retained a consultant, Analytical Environmental Services ("AES"), to submit a draft Environmental Assessment (an "EA").[3] The draft EA was

---

[3] Pursuant to 40 C.F.R. § 1508.9, an EA is "a concise public document for which a Federal agency is responsible that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS]."

submitted to the BIA on July 15, 2003. The BIA reviewed the draft EA and suggested numerous revisions. In May 2004, the EA was finalized. The BIA made the EA available for public review and comment by publishing a Notice of Availability in a Marysville newspaper and mailing the EA to local, State, and tribal governments. On July 7, 2004, the BIA sent a copy of the EA to Colusa. Although NEPA and administrative regulations provide for the receipt of comments as to the EA, Colusa did not comment on it.

Third, after receipt of comments by others than Colusa on the EA, the BIA decided to prepare an EIS to analyze further the possible environmental effects of the proposed fee-to-trust acquisition. Toward that end, the BIA entered into a "Professional Services Third-Party Agreement" with AES on January 6, 2005. The Agreement states that the BIA would "provide AES the technical direction, review, and quality control for the preparation of the Scoping Report, EIS, technical studies, and other NEPA-related documents" and that AES would be the "project manager on behalf of [the] BIA." Enterprise would pay AES's fees.

Fourth, after having hired AES, the BIA engaged in a "scoping" process. "Scoping is a process that continues throughout the planning and early stages of preparation of an [EIS] . . . to engage State, local and tribal governments and the public in the early identification of concerns, potential impacts, relevant effects of past actions and possible alternative actions." 43 C.F.R. § 46.235. A "scoping" meeting was held on June 9, 2005 in Marysville. The BIA also published a Notice of Intent to Prepare an EIS in the Federal Register on May 20, 2005, and in Marysville and Sacramento newspapers shortly thereafter. Comments to the scoping process were submitted in writing and at the public meeting. Colusa did not comment.

Fifth, having engaged in the scoping process, AES prepared a draft EIS ("DEIS"), which it completed under the BIA's supervision in February 2008. The DEIS analyzed five potential alternatives to the regulatory action: A) Enterprise Rancheria's proposed facility on the Yuba Site; B) a smaller casino without a hotel on the Yuba Site; C) a water park on the Yuba Site; D) a small casino on another site in Butte County; and E) no action. The DEIS recognized that while the proposed facility on the Yuba Site would benefit Enterprise, "the surrounding tribes that operate casinos could experience decreases in winnings, and potentially be adversely impacted by the decreases," with the proposed casino/hotel project expected to capture "approximately $77 million [per year] in total gaming win[nings] from the local market." The analysis was based on a study by the company Gaming Market Advisors from June 2006 contained in Appendix M of the DEIS, entitled "Socio-Economic, Growth Inducing and Environmental Justice Impact Study."

The DEIS was made available for review and comment was invited through publication in the Federal Register, and in Chico, Marysville, Oroville, and Sacramento newspapers. A public hearing was held on April 9, 2008. While multiple comments on the project were submitted, including by Indian Tribes who were opposed to the project,[4] again, Colusa did not submit any comments on the project.

---

[4] For example, on April 8, 2008, the Picayune Rancheria of the Chukchansi Indians expressed to the BIA its view that "[t]he acquisition of land outside of the tribe's historic homelands solely to allow for a tribe to own a casino is inconsistent with the congressional intent behind the IRA." The Chukchansi Indians are not a party to this lawsuit.

Sixth, in addition to complying with the regulatory steps required by NEPA, Enterprise and the BIA took the steps required under IGRA's Secretarial two-part determination. In Part 1 of the Secretarial two-part determination, the Secretary of the Interior determines whether "a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community." 25 U.S.C. § 2719(b)(1)(A). In making his determination that the project will not be "detrimental" to the surrounding community, the Secretary is required to seek the consultation of State and local officials, including officials of nearby Indian tribes and other communities surrounding the proposed site. 25 C.F.R. § 292.13. The regulations specify that the "surrounding community means local governments and nearby Indian tribes located within a twenty-five-mile radius of the site of the proposed gaming establishment." *Id.* § 292.2. However, a local government or Indian tribe "located beyond the [twenty-five]-mile radius may petition for consultation if it can establish that its governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment." *Id.*

The BIA commenced the consultation on January 16, 2009, and sent letters to State and local officials within a twenty-five-mile radius of the Yuba Site soliciting their input on the proposed project. Colusa is not located within twenty-five miles of the proposed casino project. Colusa wrote to the BIA on June 23, 2009, and stated that Colusa should be consulted and that, given the potential impact of the proposed casino on Colusa's own casino revenues, the BIA should not "slavish[ly] adhere[] to the arbitrary [twenty-five]-mile standard." In response, the BIA provided Colusa with Enterprise's fee-to-trust application and the two-part

determination request. Colusa did not respond to the BIA's letter.

Seventh, in May 2010 the BIA completed the final EIS (the "FEIS"). The FEIS retained the same five alternatives which were contained in the DEIS, and incorporated the same analysis as included in the DEIS with respect to the casino alternatives' effects on other tribal casinos. The BIA made the FEIS available for public review and comment by publishing a Notice of Availability in the Federal Register and Chico, Marysville, and Oroville newspapers. Colusa then submitted a comment letter dated September 7, 2010. The comment letter complained that the FEIS's Purpose and Need Statement was unduly restrictive; the FEIS failed to consider reasonable alternatives; and Appendix M, which analyzed the effect of the proposed casino on other tribal casinos, relies on "conjecture rather than data." The BIA responded to each of the comments.

Eighth, having published the FEIS and considered comments, the BIA published its Record of Decision under IGRA (the "IGRA ROD") in September 2011. The IGRA ROD concluded that the project would "1) be in the best interest of the Tribe and its members; and 2) that it would not be detrimental to the surrounding community." Pursuant to 25 U.S.C. § 2719(b)(1)(A), the BIA sought the concurrence of California Governor Jerry Brown in its decision. Governor Brown concurred by letter dated August 30, 2012.

Finally, the BIA issued a Record of Decision under the IRA ("IRA ROD") in November 2012 pursuant to 25 U.S.C. § 5108. The IRA ROD concluded the trust acquisition on the Yuba Site would "provide the Tribe with the best opportunity for attracting and maintaining a significant, stable, long-term source of governmental revenue, and

accordingly, the best prospects for maintaining and expanding tribal governmental programs to provide a wide range of health, education, housing, social, cultural, environmental, and other programs, as well as employment and career development opportunities for its members."

## II.

The lawsuits began immediately following the IRA ROD's publication. The United Auburn Indian Community of the Auburn Rancheria (the "UAIC") filed a complaint in the District of Columbia on December 12, 2012. Colusa filed a complaint in the Eastern District of California a few days later. On December 20, 2012, Citizens filed a complaint in the District of Columbia as well. The Citizens and UAIC cases were consolidated and transferred to the Eastern District of California. On January 23, 2013, the Citizens/UAIC case was further consolidated with Colusa's into a single case. Enterprise intervened as a defendant. Citizens, Colusa, and UAIC immediately moved for injunctive relief to prevent the BIA from taking the land into trust for Enterprise. The motion for injunctive relief was denied. The Yuba Site was taken into trust on May 15, 2013. The lawsuit, however, continued.

Before the district court, the UAIC, Citizens, and Colusa alleged that Interior violated NEPA, IGRA, the IRA, and the Clean Air Act, 42 U.S.C. § 7506(c). The parties cross-moved for summary judgment. In support of their motion for summary judgment, Colusa submitted a Declaration by economist Alan Meister, dated October 9, 2014, along with a two-page summary of a study Meister oversaw entitled "Economic Impacts of the Proposed Enterprise Rancheria Casino on the Colusa Indian Community & Colusa Casino Resort," (together the "Meister Declaration"), which purports to demonstrate that Enterprise's proposed casino

will have a devastating economic impact on Colusa. As a result, the Meister Declaration is particularly relevant to Plaintiffs' claim that Defendants violated IGRA, as IGRA requires the Secretary to determine that the proposed casino will not be "detrimental to the surrounding community." 25 U.S.C. § 2719(b)(1)(A).

The regulatory process ended when the IRA ROD was issued on November 21, 2012. However, the Meister Declaration first appeared as an exhibit in support of Colusa's 2014 motion for summary judgment, and therefore was not in the Administrative Record considered by the Agency. Interior moved to strike the Meister Declaration from the district court record. The district court granted the motion to strike the Meister Declaration because it post-dates the Agency decision.

On September 23, 2015, the district court granted Defendants' motion for summary judgment on each of plaintiffs' claims. Plaintiffs also filed a motion for reconsideration, which the district court denied on January 20, 2017.

Both Colusa and Citizens timely appealed the district court's decision, and those appeals were consolidated into this action. The UAIC is not a plaintiff in this action.

### III.

We review the district court's grant of summary judgment *de novo*, *Schneider v. Vennard* (*In re Apple Computer Sec. Litig.*), 886 F.2d 1109, 1112 (9th Cir. 1989), and its order to strike the Meister Declaration for abuse of discretion, *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010). Under the Administrative Procedure Act, 5 U.S.C. § 706 *et. seq.*, an agency's action

may be reversed only if it was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 727 (9th Cir. 2004).

IV.

Citizens and Colusa raise a host of statutory, regulatory, and procedural challenges to the Enterprise trust acquisition.[5]

### A. Challenges Based on the Indian Reorganization Act

#### 1. Statutory Authority for Trust Acquisition

As a preliminary matter, Citizens argues that the Department of the Interior does not have the statutory authority under the IRA to take land into trust for Enterprise. Citizens argues that while Enterprise may be recognized as an Indian Tribe today, Interior has failed to establish that Enterprise was an Indian Tribe under federal jurisdiction in 1934, the year the IRA was passed.

Citizens is incorrect. 25 U.S.C. § 5108 authorizes the Interior to take land into trust "for the purpose of providing land for Indians." The IRA defines "Indians" as "all persons of Indian descent who are members of any recognized Indian

---

[5] Colusa has also moved for judicial notice of the notices granting petitions for review in the California Supreme Court of *Stand Up for California! v. State*, 211 Cal. Rptr. 3d 490 (Ct. App. 2016) and *United Auburn Indian Community of Auburn Rancheria v. Brown*, 208 Cal. Rptr. 3d 487 (Ct. App. 2016). Those cases are potentially relevant only to Colusa's separate motion to stay, which we have already denied. *See* Dkt. No. 31. The motion for judicial notice is therefore **DENIED.**

tribe" that was "under Federal jurisdiction" at the time of the IRA's enactment. 25 U.S.C. § 5129, *Carcieri v. Salazar*, 555 U.S. 379, 382 (2009). The IRA further states that "[t]he term 'tribe' wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, *or the Indians residing on one reservation*." 25 U.S.C. § 5129 (emphasis added). The parties agree that the Enterprise Rancheria is a reservation, and that Indians have lived on it since at least 1915.[6] Therefore, Indians have been living together on the Enterprise Rancheria reservation since at least 1915—Enterprise is, by the terms of the IRA, a tribe for whom Interior may acquire land in trust. 25 U.S.C. § 5129.

The Enterprise tribe was also "under Federal jurisdiction" at the time of the IRA's enactment. IRA Section 18 included an opt-out provision, and Enterprise voted to opt out in an election held on June 16, 1935. In the IRA ROD, the BIA states that "[t]he calling of a Section 18 election at the Tribe's Reservation conclusively establishes that the Tribe was under federal jurisdiction."

Citizens disputes that the Section 18 election demonstrates the existence of a *single* tribe on the reservation. Citizens reasons that contemporaneous accounts from the Department of Interior show that Indians with differing tribal ancestries often lived together on the same reservation, and that in any event the voting record from the Section 18 election does not describe any specific tribal affiliation of those Indians who voted. Taken together,

---

[6] As Citizens acknowledges, the record establishes that the United States purchased the land which became known as the Enterprise Rancheria in 1915 so that certain Indians "may have a permanent home on this land."

Citizens concludes that, while the Section 18 election may be evidence that individual Indians were living at the reservation, the election does not demonstrate that those Indians were part of a *single* recognized tribe. The individuals who voted in that election may have had multiple tribal affiliations, or no affiliation at all.

Citizens' argument ignores the expansive definition of "tribe" contained in the IRA. Specifically, the IRA's definition of "tribe" includes "Indians residing on one reservation." 25 U.S.C. § 5129. Citizens' observation that there may have been individuals with differing tribal ancestries who voted in the 1935 election is irrelevant: there is nothing to suggest that Congress precluded Indians from holding multiple tribal identities.[7] *See Cty. of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1015, 1028 (9th Cir. 2017) (determining that the Ione Band is an Indian Tribe despite having its origin as "the amalgamation of several 'tribelets' indigenous to Amador county").

To hold otherwise would also invite a circuit split. In *Stand Up For California! v. United States Department of Interior*, 879 F. 3d 1177 (D.C. Cir. 2018), the D.C. Circuit concluded that a 1935 Section 18 election may be used to demonstrate the existence of an Indian Tribe under federal jurisdiction for purposes of the IRA. *See id.* at 1181–83. The posture of that case is nearly identical to this one. In *Stand Up for California!*, the plaintiff objected to Interior's acquisition of a tract of land for the benefit of the North Fork Rancheria of Mono Indians (the "North Fork") so that the

---

[7] *Cf.* Act of Aug. 11, 1964, Pub. L. No. 88-419, 78 Stat. 390, 391 (clarifying that a prior statute which stripped Indian status from certain reservation residents left those affected wholly bereft of Indian status only if they were "not members of any other tribe or band.")

North Fork could build a casino. As in this case, the North
Fork Record of Decision cited a Section 18 election held on
the North Fork reservation shortly after the passage of the
IRA as evidence the North Fork Indians were a "tribe"
"under federal jurisdiction" in 1934. *Id.* at 1182–84. The
plaintiff argued that the election was "insufficient to
establish, broadly, that the participants in the North Fork's
[S]ection 18 election belonged to any one tribe." *Id*. at 1182.
The D.C. Circuit analyzed the "IRA's clear text," and
concluded that the "'Indians residing on one reservation'
comprise a 'tribe' under the Act.'" *Id*. at 1183 (citing
25 U.S.C. § 5129). The D.C. Circuit therefore concluded
that a Section 18 election held on a reservation represents
adequate evidence of the tribe's existence, as "'nothing in
the text of [the IRA] requires a tribe' within the meaning of
the statute 'to be "single," "unified," or comprised of
members of the same historically cohesive or
ethnographically homogenous tribe.'" *Id*. (alterations in
original) (quoting *Stand Up for California! v. U.S. Dep't of
the Interior*, 204 F. Supp. 3d 212, 289 (D.D.C. 2016)). We
agree.

To summarize, Citizens is correct that the BIA has an
affirmative obligation to show that Enterprise was a "tribe"
under federal jurisdiction in 1934. But because of the IRA's
expansive definition of "tribe," evidence demonstrating that
a group of Indians was "residing on one reservation" in 1934
would suffice to demonstrate that those Indians were in a
"tribe" pursuant to the IRA. The parties do not dispute that
Indians have been residing on Enterprise Rancheria, a
reservation, since the Rancheria was established in 1915.[8]

---

[8] We also agree with the D.C. Circuit in *Stand Up for California!*
that we may consider the record evidence describing the 1915 land
acquisition. *See Stand Up for California!*, 879 F.3d at 1183 ("Stand Up

The Section 18 election further demonstrates the "tribe" was under federal jurisdiction when the IRA was enacted. The Interior therefore had authority to take land into trust for Enterprise's benefit.

## 2. "Need" for the land

The implementing regulations for the IRA, which are contained in 25 C.F.R. Part 151, explain that the Secretary may take land into trust for tribes if "the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing." 25 C.F.R. § 151.3(a)(3). Among other things, the Secretary must specifically consider "[t]he need of the individual Indian or the tribe for additional land." 25 C.F.R. § 151.11(a).[9] The

insists that we may not consider this purchase because the Department treated the section 18 election alone as 'conclusively establish[ing] that the [North Fork] was under Federal jurisdiction' in 1934. Stand Up misreads the Department's decision. Although the Department treated the election held 'at the Tribe's Reservation' as dispositive of the government's jurisdictional relationship with the reservation's residents, it presupposed that the reservation was a 'Tribe's.' The source of that presupposition becomes clear in the decision's very next section, where the Department characterized the 1916 Rancheria purchase as establishing the North Fork's 'tribal land.'"). So too here. In our case, the IRA ROD states that the "Section 18 election at the Tribe's Reservation conclusively establishes that the Tribe was under federal jurisdiction." That statement presupposes that the reservation was the Tribe's. As in *Stand Up for California!*, the source of that presupposition appears in the very next section, wherein the IRA ROD describes the land purchased in 1915 as the "Tribe's . . . land holdings."

[9] The other considerations include, (a) the statutory authority for the acquisition and any limitations contained in such authority; (c) "the purposes for which the land will be used"; (e) if the land acquired is in unrestricted fee status, the impact on the State resulting from the removal of the land from the tax rolls; (f) "jurisdictional problems and potential

IRA ROD explained that Enterprise had limited land holdings, and with such limited holdings, "the Tribe has been unable to exercise many of its sovereign powers. The Tribe's office is located on non-Indian fee land, and there is no usable land base for tribal housing programs of any kind or economic development. The Tribe needs the subject parcel held in trust in order to better exercise its sovereign responsibility to provide economic development to its tribal citizens."

Colusa argues in their opening brief that the IRA ROD "did not find that Enterprise had a 'need' for the Yuba Parcel . . . so much as a 'desire' for it." In other words, this *particular* parcel is not essential for Enterprise's economic development, and Enterprise therefore does not need it, as other parcels might provide adequate opportunity for economic development.

Colusa asks the impossible. It is unclear how any trust application can prove a negative and demonstrate that a single parcel of land—and only that particular parcel—will suffice. Colusa points to no case, and we are aware of none, where a court has mandated such an undertaking. By contrast, in *South Dakota v. United States Department of the Interior*, 423 F.3d 790, 801 (8th Cir. 2005), the Eighth Circuit rejected a similar argument. In that case, the court

conflicts of land use which may arise"; (g) if the land is acquired in fee status, whether the BIA is equipped to discharge additional responsibilities; (h) the extent to which the applicant provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substance Determinations. 25 C.F.R. § 151.11 (a), incorporating by reference 25 C.F.R. § 151.10 (a)-(c), (e)–(h).

considered the State of South Dakota's appeal of Interior's decision to take certain land into trust for the Lower Brule Sioux Tribe. *Id.* at 793. One of the plaintiff's arguments was that the Secretary did not describe sufficiently the tribe's "need" for the land. *Id.* at 801. The panel determined that it is "sufficient for the Department's analysis to express the Tribe's needs and conclude generally that IRA purposes were served." *Id.*[10] We agree. Interior determined that Enterprise needed economic development; the Yuba Site provides an opportunity for Enterprise to engage in that development.

Second, Colusa argues that the existence of other parcels owned by Enterprise somehow undercuts Enterprise's need for the land. Colusa notes that Enterprise previously purchased land in Butte County, with funds granted by the United States Department of Housing and Urban Development and one of the authorized uses for that land is economic development. But the existence of other land does not undercut Enterprise's "need" for the Yuba parcel. Indeed, Colusa had recognized in its 2010 comments on the FEIS that Enterprise intends to use the sixty-three-acre parcel for tribal member housing purposes. Enterprise secured a place for its members to live. That does not render arbitrary or capricious its acquisition of a place for them to work as well.

---

[10] South Dakota had argued that the Secretary did not provide enough detail describing why it was necessary to take the land into trust status rather than fee status. The Eight Circuit determined that "it would be an unreasonable interpretation of 25 C.F.R. § 151.10(b) to require the Secretary to detail specifically why trust status is more beneficial than fee status." *South Dakota*, 423 F.3d at 801.

### 3.  Mis-description of the Parcel

On December 3, 2012, Interior published in the Federal Register a Notice of Final Agency Determination to take land into trust for the benefit of Enterprise Rancheria, 77 Fed. Reg. 71612. That Notice included a description of the land to be taken into trust. However, the notice provided an incorrect legal description of an eighty-acre parcel—the parcel which would be divided prior to the transfer of forty acres into trust for Enterprise's benefit. Interior corrected this error in the legal description the following month. *See* 78 Fed. Reg. 114 (Jan. 2, 2013).

Colusa infers from this mis-description that Interior did not actually know what piece of land was being taken into trust, thereby rendering the final ROD arbitrary and capricious.

However, the administrative record is replete with descriptions of the correct forty-acre parcel, including detailed maps. The mis-description was a trivial error that was quickly corrected. Colusa cites no case law, and we are aware of none, indicating that such trivial errors require the invalidation of an ROD.

### B. Challenges based on the Indian Gaming Regulatory Act

IGRA generally prohibits gaming on lands which the Government has taken into trust for an Indian tribe after 1988, 25 U.S.C. § 2719(a).  However, gaming may be allowed when

> the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby

Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination.

*Id.* § 2719(b)(1)(A). This process is referred to as a "Secretarial Determination." Pursuant to the statute and its implementing regulations, there are four basic steps to a Secretarial Determination: 1) the Secretary consults with relevant State and local officials, including "nearby" Indian tribes; 2) the Secretary determines, after consultation, that the proposed site is in the best interest of the tribe which will engage in the gaming; 3) the Secretary determines that the proposed site will not be "detrimental to the surrounding community"; and 4) the Secretary receives the concurrence from the Governor of the affected State (in this case, California). *See id.* According to the implementing regulations, a tribe is "nearby" when it is within twenty-five miles of the proposed site. 25 C.F.R. § 292.2.

Colusa describes three alleged errors in this process. First, Colusa argues that the BIA erred when it failed to consult with Colusa. Second, Colusa argues that the regulation which mandates consultation only with those communities within twenty-five miles of the proposed trust acquisition is invalid. Finally, Colusa argues that the Secretary's finding that the proposed casino project would not be "detrimental to the surrounding community," 25 U.S.C. § 2719(b)(1)(A), was arbitrary and capricious. To support that argument, Colusa contends that a document it submitted on summary judgment—the Meister

Declaration—shows that the casino project would be detrimental to Colusa and should not have been stricken by the district court.

Citizens argues the IGRA ROD's determination that the proposed acquisition would not be "detrimental to the surrounding community" is arbitrary and capricious because the IGRA ROD fails to explain how necessary mitigation measures will be enforced.

### 1. The BIA's consultation with Colusa

IGRA requires the Department of the Interior to consult with "nearby" Indian tribes when Interior considers a trust acquisition for the purpose of Indian gaming. The implementing regulations, 25 C.F.R. § 292.2, define as "nearby" those tribes located within a twenty-five mile radius. A tribe "located beyond the [twenty-five]-mile radius may petition for consultation if it can establish that its governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment." 25 C.F.R. § 292.2. Colusa is located more than twenty-five miles from the location of the proposed hotel and casino project.

On January 16, 2009, the BIA sent letters to State and local officials within a twenty-five-mile radius of the Yuba Site to solicit input and "consult" on the proposed project. These State and local officials did not include members of Colusa. On June 23, 2009, Colusa wrote to the BIA and stated that Colusa, despite being located more than twenty-five miles from the Yuba Site, should be consulted. On July 18, 2009 the BIA wrote a letter back to Colusa. That letter enclosed a number of documents including Enterprise's fee-to-trust application, and explained that although "pursuant to 25 C.F.R. Part 292 you do not qualify as a nearby tribe for

purposes of consultation under this part, you may submit comments and/or documents that establish that your governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment." Colusa never responded to the BIA's letter.

Nothing more was required of the BIA. It allowed Colusa, pursuant to the implementing regulations, to petition for consultation. Colusa chose not to do so.

### 2.  Colusa's challenge to 25 C.F.R. § 292.2

Colusa next argues that the implementing regulations defining "nearby" as within twenty-five miles are invalid. Colusa appears to bring both a facial and an as-applied challenge to the twenty-five mile radius.[11]

Both challenges fail. To prevail in a facial challenge, Colusa "must establish that no set of circumstances exists under which the regulation would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (alteration in original omitted) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Colusa has not attempted to do so beyond its conclusory condemnation of the regulation. Colusa does not explain why in all circumstances, a definition of the word "nearby" as meaning "within twenty-five miles" is arbitrary and capricious. Colusa is also unable to show the regulation was invalid as it was applied to them.  Colusa has not proffered any evidence establishing that the procedure in 25 C.F.R. § 292.2, which requires tribes like Colusa to

---

[11] We say "appears" to bring facial and as-applied challenges because the words "facial" and "as-applied" are not specifically used in Colusa's briefing.

petition for consultation, is especially burdensome, or even that it would have been difficult for Colusa to show that its "infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment." 25 C.F.R. § 292.2. In any event, regardless of the twenty-five-mile radius for consultation of Tribes within that area, Colusa *was* given an opportunity to consult. Colusa's as-applied challenge therefore also fails.

### 3. *The Meister Declaration*

IGRA requires that the proposed trust acquisition "not be detrimental to the surrounding community." 25 U.S.C. § 2719(b)(1)(A). In support of its determination that the proposed casino will not be detrimental, the FEIS, which is explicitly referenced by the IGRA ROD, included a study on the economic impact of the casino. Contained in Appendix M of the FEIS, the study, entitled "Socio-Economic, Growth Inducing and Environmental Justice Impact Study," employed a so-called "gravity model" to determine the likely effect of the proposed casino on competitor casinos.[12] The

---

[12] As Appendix M explains, the gravity model is an application of Newton's Universal Law of Gravitation. Newton's Law states that every particle in the universe attracts every other particle with a force that is directly proportional to the product of their masses, and inversely proportional to the square of the distance between them. With respect to commerce, the gravity model posits that two equally sized commercial establishments which are equidistant from a given individual will have the same "pull" on that individual. Should one of the establishments be twice the size of the other, it will have twice the pull on the individual. In the study contained in Appendix M, AES states that "[b]y estimating the revenue levels at each of the casino properties within the competitive set, researching the number of gaming positions provided within each, visiting each facility to understand the relative aesthetic attractiveness (including a consideration of non-gaming amenities), and utilizing

Appendix M study concluded that "those casinos closest to the subject Enterprise Rancheria are expected to experience the greatest loss of revenue," with a total "cannibalization" of approximately "$76.8 million in gaming win[nings] from the local market area." It further concluded that the loss in revenues would be distributed among twelve competing casinos, with the "two market leaders, Thunder Valley and Cache Creek, absorbing nearly 2/3 of the drop in revenue." The study estimated that Colusa's casino would lose approximately $4.3 million per year. Colusa does not argue that $4.3 million per year represents a detrimental loss.

Nevertheless, on summary judgment Colusa disputed the conclusions of the Appendix M study. In support of its summary judgment motion Colusa submitted the Meister Declaration, which concluded that the Enterprise casino would have a larger economic impact on Colusa's casino than indicated by the study in Appendix M. The Meister Declaration did not provide the data on which its conclusion was based.

The district court struck the Meister Declaration because it represents extra-record evidence. It correctly noted that the Ninth Circuit allows for a court to review material outside of the administrative record in four narrow circumstances:

> 1) where the extra-record evidence is "necessary to determine whether the agency has considered all relevant factors and has explained its decision";

gaming factors from proprietary and public sources, the model can be calibrated to current market conditions."

2) where "the agency has relied on documents not in the record";

3) where "supplementing the record is necessary to explain technical terms or complex subject matter"; or

4) where "plaintiffs make a showing of agency bad faith."

*Sw. Ctr. For Biological Diversity v. U.S. Forest Serv.,* 100 F.3d 1443, 1451 (9th Cir. 1996) (internal citations omitted). Colusa does not dispute the district court's rejection of exception 4 (agency bad faith) or exception 2 (reliance on material not in the administrative record).

The district court did not abuse its discretion when it determined that the Meister Declaration was not "necessary to explain technical terms or complex subject matter" (exception 3). The Meister Declaration does not explain technical terms or elucidate complex subject matter. It endorses the methodology employed by the 2006 study contained in Appendix M, but criticizes that study as reliant on bad data. The Meister Declaration was provided to *rebut* Appendix M, not to explain it.

The district court also did not abuse its discretion when it determined that the Meister Declaration was not "necessary to determine whether the agency has considered all relevant factors" (exception 1). The Meister Declaration provides new analysis regarding the economic effects of the proposed gaming site on competing casinos. But the economic effects on other tribes' casinos is a problem that the BIA considered, even if the specific data proffered in the Meister Declaration was not available to the BIA.

Further, even if one of the enumerated exceptions did apply, it would be of no matter, because "exceptions to the normal rule regarding consideration of extra-record materials only apply to information available at the time, not post-decisional information." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (original alterations and internal quotation marks omitted); *see also id*. at 1130–31 ("[P]ost-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision because it inevitably leads the reviewing court to substitute its judgment for that of the agency." (internal quotation marks omitted)). The Meister Declaration was executed June 24, 2014 and the study it contains is dated May 2013. The Meister Declaration and its accompanying study therefore post-date the 2011 IGRA ROD by approximately two years.

Nor is it clear whether the *data* pre-dates or post-dates the Agency decision. The Meister Declaration attached a single exhibit—a two page "report" which summarizes Meister's projections regarding Colusa's revenues. That report makes predictive statements about the effect of the Enterprise project on Colusa's revenues in 2016 through 2018, and states that it is "based on actual data from both the Colusa Casino Resort and the Colusa Indian Community." However, the report does not state the years from which the data were drawn, or describe the data with any specificity. The data were never provided to Interior.

Because the Meister Declaration is not necessary to determine whether the agency has considered all relevant factors and has explained its decision, *Sw. Ctr. For Biological Diversity*, 100 F.3d at 1451, and because the analysis contained within it post-dates the IGRA ROD, the

district court did not abuse its discretion when it granted the motion to strike.

### 4. *Enforcement of Mitigation Measures*

Citizens also argues that the Secretary's determination that there will be no detrimental harm to the surrounding community was arbitrary and capricious. Citizens asserts that the mitigation measures to which Enterprise agreed, and which the IGRA ROD acknowledges are necessary to prevent detrimental harm to the surrounding community, are not enforceable. Citizens argues that as a result it was arbitrary and capricious for the BIA to rely on such "illusory" mitigation.

In the IGRA ROD, Interior states that it has "considered potential effects to the environment, including potential impacts to local governments and other tribes, has adopted all practicable means to avoid or minimize environmental harm, and has determined that potentially significant effects will be adequately addressed by . . . mitigation measures." The IGRA ROD further states that the "Preferred Alternative"—i.e., the selection of the Yuba Site for the casino project—would be implemented "subject to implementation of the mitigation measures." The IGRA ROD contains approximately twenty pages of detailed mitigation measures, ranging from the requirement that Enterprise "install a trash compactor for cardboard and paper products," to the requirement that Enterprise implement water conservation measures. The mitigation measures also include less specific requirements; for example, Enterprise is told to "enter into [a Memorandum of Understanding] or provide for a similar agreement to reimburse the affected law enforcement department for the provision of law enforcement services [which would] include compensation for increased equipment or staffing needs." In addition, the

IGRA ROD adopted by reference the mitigation measures listed in the FEIS.

Again, Citizens concedes that the many mitigation measures listed, if implemented, would be adequate. Citizens contends however that there is no guarantee the measures will be implemented at all. Due to Tribal sovereign immunity, which insulates Enterprise from suit, the jurisdictions that are affected by negative externalities of the casino project may not be able to compel Enterprise to live up to its mitigation obligations. *See, e.g.*, *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2028 (2014) (holding that tribes enjoy sovereign immunity from suit for on- and off-reservation activities). Citizens concludes that such failure to include enforcement mechanisms renders mitigation "illusory."

In a matter of first impression, we find that it is within the expertise of the Agency to determine the likelihood required mitigation measures will be followed, and the BIA's determination that Enterprise would fulfill its required mitigation measures was not arbitrary or capricious. In *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), the Supreme Court summarized what a reviewing court may consider when it determines whether an agency decision is arbitrary and capricious. The Court ruled that,

> [r]eview under the arbitrary and capricious standard is deferential; we will not vacate an agency's decision unless it has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

> implausible that it could not be ascribed to a
> difference in view or the product of agency
> expertise. We will, however, uphold a
> decision of less than ideal clarity if the
> agency's path may reasonably be discerned.

*Id.* at 658 (internal quotation marks and citations omitted). Citizens does not allege that there were factors which the BIA considered which "Congress had not intended it to consider" or that an explanation was offered that "runs counter to the evidence before the agency." *Id.* Neither is the BIA's conclusion that Enterprise would engage in the agreed-upon mitigation "so implausible that it could not be . . . the product of agency expertise." *Id.*

Only one factor described in *Defenders of Wildlife*—that a decision may be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem"—is arguably applicable, as mitigation is an important factor for the BIA to consider. However, Citizens does not argue that the agency "failed to consider" mitigation. It argues that the mitigation the agency considered was "illusory" because of the difficulties in enforcement; *i.e.*, that the agency's *prediction* that mitigation would take place is unreasonable. But "[t]he 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments." *Stand Up For California!*, 879 F.3d at 1188 (quoting *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009)). And indeed, Citizens has not argued that it is unlikely or "implausible" that the needed mitigation will take place. Citizens has not presented, for example, an economic argument describing why it is unlikely that Enterprise will fulfill its mitigation obligations. Absent more, we will not speculate upon reasons Enterprise may decide not to live up to its

agreements. The Agency concluded they will, and absent evidence, we will not gainsay the Agency's conclusion.

## C. *Challenges based on the National Environmental Policy Act*

While NEPA establishes a "national policy [to] encourage productive and enjoyable harmony between man and his environment," 42 U.S.C. § 4321, "NEPA itself does not mandate particular results," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Public Citizen*¸541 U.S. 752, 756–57 (2004). Colusa argues that the FEIS was procedurally deficient in a number of ways.

### 1. *Purpose and Need Statement*

NEPA's implementing regulations require that an EIS contain a statement describing the "purpose and need" of the project, which "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action," 40 C.F.R. § 1502.13. Further, in the EIS, the agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14. While agencies enjoy "considerable discretion," to define the purpose and need of a project, *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998), in doing so "an agency cannot define its objectives in unreasonably narrow terms," *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). "Courts evaluate an agency's statement

of purpose under a reasonableness standard…and in assessing reasonableness, must consider the statutory context of the federal action at issue…[while] [a]gencies enjoy considerable discretion in defining the purpose and need of a project…they may not define the project's objectives in terms so unreasonably narrow, that only one alternative would accomplish the goals of the project." *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1230 (9th Cir. 2014) (citations and internal quotation marks omitted).

Colusa argues the FEIS's "purpose and need" statement was "artificially limited." It was not.

The FEIS explained that the objectives of the trust acquisition were to

- Restore trust land to the Tribe in an amount equal to the amount of land previously lost as a result of federal action . . . .

- Provide employment opportunities for tribal members and [the] non-tribal community.

- Improve the socioeconomic status of the Tribe by providing a new revenue source that could be utilized to build a strong tribal government, improve existing tribal housing, provide new tribal housing, fund a variety of social, governmental, administrative, educational, health, and welfare services to improve the quality of life of tribal members, and to provide capital for other economic development and investment opportunities.

- Allow Tribal members to become economically self-sufficient, thereby eventually removing Tribal members from public-assistance programs.

- Fund local governmental agencies, programs, and services.

- Make donations to charitable organizations and governmental operations.

- Effectuate the Congressional purposes set out in [IGRA].

The Purpose and Need Statement further states that the Tribe "has no sustained revenue stream" which can be used to fund programs for Tribal members.

The Purpose and Need Statement is quite broad. It describes the BIA's intent to provide Enterprise with a vehicle for substantial economic development, and the various benefits that may accrue from economic self-sufficiency. Colusa argues that the "narrow" Purpose and Need Statement led to a deficient analysis of possible alternatives. But the BIA considered five possible alternatives: Alternative A, the hotel casino project that was ultimately accepted on the Yuba Site; Alternative B, a smaller casino on the Yuba Site; Alternative C, a water park on the Yuba Site; Alternative D, a casino on an alternate site in Butte County; and Alternative E, no action. The FEIS considered in detail the environmental and economic consequences of each alternative. Based on the analysis of the possible alternatives in the FEIS, the Interior concluded that the best alternative was the one selected—Alternative

A, the casino/hotel project on the Yuba Site.**[13]** The range of alternatives was not "illusory."

In addition, Colusa argues that the FEIS should have analyzed two additional sites—1) a site in Oroville

---

**[13]** The IGRA ROD explains why Alternative A, the Yuba hotel-casino site, was ultimately selected:

> Alternatives B and C, while slightly less intensive than Alternative A, would require similar levels of mitigation for identified impacts; however, the economic returns would be smaller than under Alternative A and the more limited development is not the most effective use of either the land or the Tribe's capital resources. The Tribe needs a development option that would ensure adequate capital resources to not only fund Tribal programs but fund mitigation measures for identified impacts and payment obligations to local jurisdictions. The reduced revenue anticipated from Alternatives B and C would limit the Tribe's ability to fund both Tribal programs and mitigation measures. Additionally, without the development of the hotel and the rural location of the Butte site, Alternative D would provide further limited opportunities for capital development to fund Tribal programs. A non-gaming entertainment development on the Yuba [S]ite would have limited competitive ability to draw patrons from the greater population centers within Yuba County and the Highway 65 corridor compared to the gaming alternatives. In addition, based on peak-hour traffic patterns for retail centers compared to gaming operations, Alternative C also would likely have equal to and in certain instances greater traffic impacts during peak hours than would Alternative A. In short, Alternative A is the alternative that best meets the purpose and need of the Tribe and the BIA while preserving the natural resources of the Yuba [S]ite. Therefore, Alternative A is the Department's Preferred Alternative.

purchased by Enterprise in 2006, and 2) an unspecified site on federal land near Enterprise 1. However, Colusa failed to propose these additional sites during the comment period. With respect to non-obvious defaults in an EA or EIS, "persons challenging an agency's compliance with NEPA must structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (original alterations, citations, and internal quotation marks omitted). A failure to identify "in their comments any rulemaking alternatives beyond those evaluated in the EA" causes those now objecting to an agency rulemaking to "forfeit[] any objection to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action." *Id.* at 764–65; *see also N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.,* 545 F.3d 1147, 1156 & n.2 (9th Cir. 2008) (finding that the Department of Transportation's highway construction project did not violate NEPA when the Agency failed to consider a tunnel alternative that was not brought to its attention until well after the notice and comment period for the EIS closed, and ruling that "any objection to the failure to consider that alternative has been waived").

During the notice and comment period, Colusa did not tell the BIA to consider the alternatives it now proposes. Having failed to do so, Colusa has waived any argument that the failure to consider those alternatives represented a violation of NEPA.

### 2. *Analysis of Data*

Next, Colusa argues that the FEIS failed adequately to analyze the effect of the proposed project on the local environment, because some of the data on which the FEIS relied was inadequate. First, Colusa argues that the

"biological data" on which the FEIS relied was "stale." Second, Colusa argues that Appendix M—which analyzed the socio-economic impacts of the Yuba Site casino project—was based on insufficient data.

### i. Biological Data

Colusa argues that unspecified "biological data" in the FEIS is outdated and cites *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005), a Ninth Circuit decision in which the court ruled that certain six-year old data on which an FEIS relied was "suspect." Colusa then states broadly that "much of the biological information" is "several years old," and "in some cases nearly ten years old."

A review of the FEIS Appendices reveals that Colusa's argument is unsupported.

The FEIS Appendices contain a variety of different studies, letters, and declarations from potentially impacted parties. For example, Appendix D contains a "Water and Wastewater Feasibility Study" prepared in July 2008, approximately two years before the publication of the FEIS, and Appendix H contains a "Biological Resources Assessment" of the site of the trust acquisition prepared in 2007, three years before the completion of the FEIS. Colusa does not explain why the data in the Appendices are unreliable.   The data in the various Appendices were generally compiled after 2006, two years prior to the publication of the DEIS, and four years prior to the publication of the FEIS. Colusa has pointed to no authority, and provided no argument, indicating that data which is four years old is inherently suspect. Colusa assigns a 2003 date to Appendix L, which contains correspondence with the State of California's Office of Historic Preservation indicating that no historic properties will be impacted. However, that

Appendix contains two letters—one from 2003, and another from 2007, the latter of which similarly concurred that no historic properties would be affected.

Apart from Appendix L, only one Appendix contains data older than 2006: Appendix E, a 2000 declaration that a proposed wastewater treatment plant on the Yuba Site would not have a significant environmental impact. This document is historic and not subject to updating, and Colusa has not alleged that this historic document was the basis of any specific conclusions drawn in the FEIS. Colusa is therefore unable to support its generalized statement that the unspecified "biological data" contained in the FEIS is "stale."[14]

### ii. Economic Data

Colusa next argues that the economic data on which Enterprise relied was flawed. As noted above, Appendix M of the FEIS contains a study authored by Gaming Market Advisors entitled "Socio-Economic, Growth Inducing and Environmental Justice Impact Study." That study described the likely economic impact of the proposed casino on other competing casinos, including that of plaintiff Colusa. Colusa argues that Appendix M relied on stale data and made improper economic assumptions. By contrast, Colusa insists that the Meister Declaration contained a more accurate accounting of the effect Enterprise's casino would have on Colusa.

---

[14] Colusa also insists that the Appendices were "compiled prior to the recently ended drought." Colusa does not state what "biological data" was affected by that drought, or otherwise cite to any case law indicating that the court should find an FEIS inadequate because of the intervention of specific weather events.

Colusa's argument is misplaced. The Meister Declaration was properly struck as extra-record evidence which post-dated the FEIS and the IGRA and IRA RODs. It also was based on proprietary data which Colusa did not provide to the BIA during the regulatory process and which Colusa still has not disclosed. Colusa cannot now rely on it here. *Pub. Citizen*, 541 U.S. at 764. Further, Colusa's argument regarding the allegedly missing economic data is connected to its claim that Colusa will experience economic harm as a result of the casino project. We have "consistently held that purely economic interests do not fall within NEPA's zone of interests." *Ashley Creek Phosphate v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005).

### 3. *Hard Look at Environmental Harm*

Colusa next argues that the FEIS failed to take a "hard look" at the environmental impacts of the proposed action.[15] Colusa describes two deficiencies: i) one regarding the air quality analysis in the FEIS, and ii) another regarding the effect of the project on certain species of fish.

Neither argument is persuasive.

---

[15] *See Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992–93 (9th Cir. 2004) ("Through the NEPA process, federal agencies must carefully consider detailed information concerning significant environmental impacts, but they are not required to do the impractical. Alternatively phrased, the task is to ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action." (original alterations, internal citations, and quotations omitted)).

*i.   Air Quality*

Colusa argued that the FEIS's analysis of air quality was deficient under NEPA, because "[t]he FEIS merely asserted that the emissions from Enterprise's proposed casino would conform to California's state plan, but did not give any figures that would support that assertion." App. Br. at 37. Colusa also argued that "it appears that NOx emissions may exceed EPA's *de minimis* threshold for both ozone and PM2.5 emissions and require offsets or other actions by DOI to conform to the California State Implementation Plan." Colusa did not elaborate on the effect of the alleged "NOx" emissions, or otherwise explain how the existence of such emissions violate the Clean Air Act, NEPA, or any other statute. As a result Colusa has waived this argument for failing to develop it. *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) ("We review only issues which are argued specifically and distinctly in a party's opening brief. We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review. [J]udges are not like pigs, hunting for truffles buried in briefs." (internal citations and quotations omitted)).

Further, Colusa's general contention that the FEIS provided insufficient figures is incorrect, as the FEIS supported its conclusion that the emissions from Enterprise's proposed casino would not violate the Clean Air Act or any California regulation. According to 40 C.F.R. § 93.153(b)(1), the *de minimis* threshold for emissions of NOx is 100 tons per year. The FEIS describes mitigation measures that will reduce emissions of NOx to below 25 pounds per day, or 4.56 tons per year, well below the regulatory threshold.

### ii.  Migratory Fish

Colusa next argues that the FEIS ignores potential harm to six fish species of concern, five of which are listed under the Endangered Species Act. Colusa argues that the FEIS should have discussed whether or not the canals near the Yuba parcel are "screened" in order to protect the migratory fish. Colusa does not proffer any evidence that there is an actual danger to these species of fish, or otherwise describe a likely effect of the casino project on the fish. The FEIS states that the fish species will not live in or near the project site.[16] Colusa does not provide any evidence or argument to undermine the FEIS's statement.

### 4.  Oversight of the FEIS

40 C.F.R. § 1506.5(c) states that an EIS "prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency . . . . It is the intent of these regulations that the contractor be chosen solely by the lead agency . . . ."

Colusa argues that the BIA failed to exercise "sufficient independent oversight over [the] preparation of the FEIS," and insists that Enterprise, rather than the BIA, "chose" AES as its contractor for the creation of the EIS. Colusa also argues that AES had an impermissible "financial interest" in the outcome of the project.

---

[16] The FEIS states that the fish "do not have the potential to occur within the study area, as the only aquatic habitats within the study area are agricultural irrigation ditches and canals or receive water supply from these ditches or canals. The water level fluctuates within these features according to crop demand and is not sufficient to support these species."

First, Colusa provides no evidence that the BIA did not make an independent choice to contract with AES. As noted above, Enterprise contracted with AES under the BIA's supervision to create a draft EA, a document which the BIA evaluated prior to deciding whether to proceed with an EIS. Having decided to create an EIS, the BIA then entered into a Professional Services Third-Party Agreement with AES. The Professional Services Third-Party Agreement states that "[t]his Agreement constitutes the required disclosure statement and the BIA's selection of AES as the primary EIS contractor." Colusa points to nothing in the Agreement, or to anything else in the record, which calls into question the BIA's representation that it chose to contract with AES for the creation of the EIS.

Second, Colusa has not shown an impermissible conflict of interest. 40 C.F.R. § 1506.5(c) states that a contractor which prepares an EIS "shall execute a disclosure statement prepared by the lead agency . . . specifying that they have no financial or other interest in the outcome of the project." AES executed such a disclosure statement. However, Colusa argues that AES in reality had an impermissible financial interest in the outcome of the project: the same Agreement containing AES's disclosure statement states that "AES . . . will supply environmental consulting services to prepare the environmental documentation and assist with obtaining permit approvals necessary to construct the project." Colusa reasons that AES will aid in helping obtain the "permit approvals necessary to construct the project" only *after* the approval of the FEIS. In other words, AES has a "financial . . . interest in the outcome of the project" per 40 C.F.R. § 1506.5(c).

However, Colusa fails to allege that any financial stake AES has in aiding with permit approvals is significant.

Moreover, the agency made a factual determination that there was no conflict of interest, and absent proof that this finding lacks substantial evidence to support it, the court should defer to the agency's factual determination. *Markair, Inc. v. Civil Aeronautics Bd.*, 744 F.2d 1383, 1385 (9th Cir. 1984).

Furthermore, a contractor's technical conflict of interest does not lead to the automatic invalidation of an FEIS or ROD. Rather, the Court "can evaluate the oversight that the agency provided to the [EIS] process as a factual matter and make a determination upholding the [EIS]." *Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1129 (10th Cir. 1998).

Colusa argues that three pieces of evidence demonstrate that the BIA failed to exercise sufficient independent oversight over the project. First, Colusa cites to "[Interior's] failure to require a sufficiently broad analysis of alternatives." But, as we have already found, the alternatives selected were facially reasonable, and Colusa provides no specific argument explaining why they are not. Second, Colusa argues that the Interior's "acceptance of pure guesswork as to the impacts on Colusa" of the proposed project shows a lack of supervision over the project. However, Colusa's alleged experience of a purely economic harm is not cognizable under NEPA, so it is unclear how, under NEPA, a failure properly to analyze that harm is evidence of improper supervision of the NEPA process. In any event, Colusa's contention that the economic harm analysis was "based on pure guesswork" is inaccurate: Appendix M to the FEIS contains a rigorous economic analysis. Finally, Colusa argues that the failure to require AES to make a certification "under penalty of perjury" demonstrates a failure of oversight. No such requirement for

a statement under penalty of perjury exists in the regulations. The failure to include such a non-required statement proves nothing.

Colusa has not presented any evidence that the BIA failed to engage in adequate independent oversight over the preparation of either the DEIS or the FEIS, or that the "consulting services" AES may perform are in any way significant. As a result, Colusa is incorrect that a technical violation of the conflict of interest provision—if such a violation occurred—mandates the withdrawal of the FEIS and invalidation of the decade-plus long regulatory process. If a violation is but "trivial," it does "not give rise to any independent cause of action." 40 C.F.R. § 1500.3.

## V.

For the above-stated reasons, we **AFFIRM** the decision of the district court.